## JOAB R. RICHARDS *vs.* JOHN W. FUQUA'S ADM'RS, &c.

A keeper of a ferry authorized by law, is bound to keep a good and secure boat, suitable and safe in all respects, both to receive and to transport all such property and vehicles as are usually required to be conveyed across public ferries. He is bound to make all provisions which under the circumstances and the situation of the ferry, were necessary for the safe delivery and passage of such property as is offered at the ferry for transportation ; and if without fault by the other party a loss is sustained in such property either in receiving or transporting it safely, by reason of the insufficiency of the boat or other means, which it was his duty to provide for that purpose, he is responsible for the injury.

It is as much a part of the duty of a keeper of a ferry to make provision for the safe reception of property, as for its safe transportation when received ; and if the boat is unsafe and insufficient in that respect, he is liable for losses occasioned to passengers in consequence of it. He is held to strict diligence and skill in the performance of his duty.

Where loss has been occasioned by the apparent negligence of the party in providing safe and sufficient means to perform what he has undertaken to the public, he comes within the rules applicable to common carriers, whatever may be the kind of property lost by his default, provided it be such property as it was his duty to transport.

IN error from the circuit court of Yazoo county ; Hon. E. G. Henry, judge.

This was an action brought by intestate, (John W. Fuqua,) in his lifetime, against plaintiff in error, (Richards,) to recover of him, as the keeper of a public ferry, the value of a negro man, named Anderson, and one mule, which were drowned in crossing Richards' ferry ; the keeping of the public ferry, and the loss of the property, are proved by any number of witnesses ; and much proof is introduced as to the insufficiency of the ferry flat kept by Richards, and the inefficiency of the ferryman who had charge of the boat, on the morning of the occurrence.   The proof was rather positive, as to the insufficiency of the boat, showing that the pin which confined it was loosely placed in, and that any pressure upon the four crosspieces would draw the pin, and the boat would go loose in the stream, there being no apron or leaf to spread out, on the banks of the river, so as to receive the wagon and ease its transit to the buoy of the boat, which was down a deep slope. That when there was no apron, the boat would reach the landing, and the end would be elevated from eight to twelve inches above the surface of the bank, so that the whole weight of a loaded wagon would be suspended upon the chain or pin, confining the chain to the boat until the wheels were drawn over the elevated ends of the boat.

One of the witnesses thought an apron or leaf to spread upon the bank, one of the usual appendages to boats of this description, and rendered them much more safe, particularly for loaded wagons.   Another witness stated, that the boy, Anderson, was drowned in very shallow water, and if April, the usual ferryman, had been there, or any other man of strength, the boy might have been saved.   That the fifteen year old boy, who had charge that morning, was as good an oarsman as April, but deficient in skill and judgment in an emergency of that kind ; that the accident occurred by reason of the boy Anderson driving the loaded wagon down the banks of the river, (the river being low,) and the boat received the mules and the fore wheels of the wagon, but when the hind wheels reached the elevated end of the boat, it was with such force,

that the pin was pulled out, and wagon, mules, and negro were drawn into the river.

*Gibbs* and *Bowman,* for appellant.

This is a suit to charge appellant as a common carrier. There is not a particle of testimony to show that the defendant was in the habit of crossing property or persons, for hire or reward, or had ever charged anybody for such service, or that any compensation was stipulated for in the particular case. The proof is simply that defendant had a ferry some of the witnesses had frequently crossed. But to charge him as a common carrier, there must be proof that he was engaged in the business of transporting property and persons for reward, or that he agreed to transport the property in question for reward. The fact that in case of a safe transportation he could have compelled payment for work and labor done, does not constitute him a common carrier with the rigid responsibility of that class. Story says in his treatise on Bailments, § 495, to constitute a common carrier, " He must hold himself out as ready to engage in the transportation of goods for hire as a business, not as a casual occupation." The court and jury assumed the fact that such was his character. It may be true, but the bill of exceptions don't show it, which is conclusive on this court.

Though we are satisfied this court will remand the case upon this point, yet it is desirable to settle other points in the case, to anticipate the possibility of plaintiff's supplying this defect of proof. We contend (admitting defendant to be a common carrier) that his liability as such never attached. There was no such delivery of possession to defendant's ferryman, or such placing under his control as to constitute a liability. Story on Bailments, § 532, says, " To render a carrier responsible, there must be an actual delivery, and when such delivery is complete, his responsibility commences." 3 Barb. S. C. R. 388; Story, Contr. § 758.

Now the proof is, plaintiff's servant was driving the wagon himself, drove it down the bank, attempted to drive it into the boat, had exclusive control of the wagon and horses, got it partially into the boat, and by his bad driving the horses were

compelled to stop, and as a necessary consequence, the boat shoved off, and the hinder part of the wagon pulled the balance out. No act of participation, even on the part of the ferryman, or any declaration by him is shown, to show acceptance of, or control over the property. His first act, by the proof referred to, was an attempt to extricate the fore wheel from the side gunwale, to prevent the wagon going overboard from the side. Can it be said, under such circumstances, that the delivery was "complete?" Had the driver of the wagon dismounted, and said to the ferryman, Here, take this team and cross it, assign me a place in the boat, would not the delivery have been more "complete?" Without this, in fact, or something equivalent, it was no delivery at all. Suppose the owner of a bale of cotton should drive to a steamboat, throw it off, and proceed himself to roll it aboard, and he should succeed in getting a part of it aboard, and by his own awkwardness, or even the staging give way, and the cotton be lost overboard, no member of the profession practising in this court would institute suit under such a state of facts. Wherein does the supposed case differ from the case before the court? In neither case is there any abandonment of the custody and control over the property, or any consequent acceptance of the common carrier. " Where goods are actually put into the wagon or barge, the carrier is not responsible, if it appear there is no intention to trust him with the custody, as if the owner's servant take upon himself the management and custody of the goods." Story, Bail. § 533. If this is the law, the court erred in refusing defendant's fifth instruction as asked for. The proviso annexed to this, and all the other instructions, was the act of the judge under protest. It is like bestowing alms, or rather paying a just due with the right hand, and robbing him with the left. If the liability of a carrier commences only from the time the property is placed under his control, what difference can it make in his responsibility, that before his responsibility attached, the boat or the ferryman was insufficient? The instruction and proviso are flatly contradictory. The proviso holds defendant to the most strict responsibility as a common carrier, both as to the negro and. mule, and makes

that responsibility commence before he has accepted the freight.

The judgment below was for the value of the negro (the driver) and one of the mules. So far as the mule is concerned, we think the liability never attached according to the authorities above referred to. But if it did, there is no proof that plaintiff owned the mule. Russell is the only witness testifying as to title and value of the property; says he does not know whether plaintiff owned the mule or not, and for this defect of proof, if for nothing else, the judgment must be reversed.

As to the driver lost, which is proved to be the property of plaintiff, we contend in addition to the position that the liability never commenced, that the strict responsibility of a common carrier does not apply to transport of negroes, and that there was no such defect in the boat or want of skill in the ferryman, as to make defendant liable. 2 Peters, R. 155, 156 ; 4 McCord, R. 223; 4 Porter, Ala. R. 238.

As to the first branch of the proposition, we refer the court to the case of *Boyce* v. *Anderson*, 2 Peters, R. 150. C. J. Marshall, in that case, adopts the rule that in the conveyance of slaves, the rule is, that " carrier is liable only for ordinary neglect." The case of *Stokes* v. *Saltonstall*, 13 Peters, 181, does not affect the case in 2 Peters. The court indeed expressly recognize the case in 2 Peters as correct, p. 192. It is true Story (on Bail. § 601) puts the responsibility a little stronger, but in the next section and § 598, it is greatly qualified, and very nearly approximates the case in 2 Peters. Chancellor Kent lays down about the same doctrine. 2 Kent, 598–600.

We contend the proof shows no " ordinary " neglect or want of skill or any other tort either. Johnson testifies he made the boat; that it was a good ferry-boat; that the bolt was secured with a key; he considered it fastened in the best mode.

*A. G.* and *S. E. Nye*, on the same side.

In Story on Bailments, § 601, it is laid down, " Passenger carriers bind themselves to carry safely those whom they take into their coaches, as far as human care and foresight will go ; that is, for the utmost care and diligence of very cautious per-

sons; and of course they are responsible for any, even the slightest neglect."

In the next section it is asserted that when an accident occurs, the presumption *primâ facie* is, that it occurred by the negligence of the coachman, and the *onus probandi* is on the proprietors of the coach to establish that there has been no negligence whatever; and that the damage or injury has been occasioned by inevitable casualty, or by some cause which human care and foresight could not prevent.

From this view of the law and an examination of the evidence, it can hardly be doubted that the finding of the jury was proper; it was at least a question fairly presented to them, whether there had not been some negligence; and if not, had defendant Richards made the necessary proof?

The fact that the boy Anderson was unnecessarily timid and leaped from the wagon when there was no necessity for it, cannot alter the case. His state of peril or alarm was brought about by the conduct of defendant Richards, in not having a sufficient boat and a sufficient ferryman. He was, then, liable for all the consequences resulting from this unnecessary timidity. Upon this point of the case the court instructed the jury in the exact language of the supreme court of the United States in the case of *Saltonstall* v. *Stokes,* 13 Peters, R. 181. The general law upon this subject is laid down in this case, and we refer to it as containing the correct law of this country, without further comment.

One of the grounds of defence we understand to be, that there was no proof that any passage had been paid; the proof was that Richards kept a public ferry, and there can be but little doubt that Fuqua was liable for it and could have been made to pay at any moment, but if we examine all the cases reported, with regard to either common carriers or passenger carriers, we shall hardly find one where the proof of payment does appear; a liability to pay is quite sufficient.

Nearly all of defendant's instructions were given, some with modifications; if any error exists it is in the finding of the jury, which we do not believe. There is not the least probability that a new trial would produce a different result.

67*

*Burrus* and *Dougherty*, for appellee.

With the evidence before a jury they could have come to no other conclusion than that there was not only ordinary diligence wanting, but there was gross negligence sufficient almost upon the facts to find a bill of indictment for manslaughter. The books abound with strong cases of recovery against common carriers without any fault on their part, and ferrymen are enumerated in that class. Slight fault, unskilfulness, or negligence either as to the competence of the carriage or the act of driving, may render them responsible in damages for an injury to passengers. They are to be transported as safely as human foresight and care will permit. 2 Kent, Comm. 600 ; *Stokes* v. *Saltonstall*, 13 Peters, R. 181 ; 9 Bing. R. 457 ; 7 Camp. R. 167.

We think a ferryman is bound to use reasonable facilities for the reception of all persons, vehicles, &c., and to use all precautions as far as human care and foresight will go for the safety of those who may cross. The books are clear that negligence of the smallest kind will make them answerable, and that it is incumbent upon the party to prove that every thing that was necessary should be well done. To close this point, we have established incontrovertibly the deficiency of the approach to the ferry, in the fact that the bank was too steep ; 2d. The want of an apron ; 3d. That the bolt was not safe, or it would not have come out with a load of fodder in a light wagon and two mules.

The attempt on the part of defendant, now appellant, to show that the boy on the wagon and fodder might have jumped on the flat, is too flimsy for us to notice. By their negligence, and that of the grossest character, our property was placed in imminent danger, and where reason never controls in like cases. It is too late for appellant to say that he, the slave, might have jumped on the boat. The case of *Stokes* v. *Saltonstall*, above referred to, is full on that point.

On the motion for a new trial appellant makes a point that there was no ferriage paid. It is certainly not necessary, as we proved that it was a public ferry, and also, by an act of incorporation, with fees to be regulated by the board of police. In our humble opinion that was all that was necessary.

We could, with great propriety, have moved for a new trial below because the jury did not give us damages for the full amount of damages proven, but we preferred to abide their verdict. The other instructions granted below, we think, are embraced to some extent in the first. We are, in the conclusion, of opinion that the law and facts below were sufficient to warrant the verdict.

Mr. Justice HANDY delivered the opinion of the court.

The first ground of error taken is, that there is no evidence in the record showing that the plaintiff in error received any compensation for transporting passengers or the property in question across the Yazoo River in the ferry-boat kept by him, and, therefore, that he was only held to ordinary diligence, which, it is insisted, is proved to have been exercised by him.

The evidence shows that the ferry was kept by the plaintiff in error as a public ferry, under the authority of an act of the legislature. It is not to be presumed that persons and property were transported free of charge. at such a ferry; and as no question appears to have been raised in the court below upon this point, it must be taken as conceded, and the jury were justified in presuming from the character of the business, that it was carried on for compensation.

The second objection insisted upon is, that there was no such delivery of the wagon and team and driver upon the ferry-boat of the plaintiff in error as will render him liable as a common carrier.

The evidence tended to prove, and the jury seem to have found, that a negro boy of the defendant in error drove his wagon and two mules, with a load of fodder, to the ferry, the ferry-boat being chained to the landing, and there being a steep hill to descend in getting into the boat; that the boy drove the wagon down the hill, and there being no apron to the boat, or other thing to break the force of the descent, it struck with such force against the gunwale of the boat as to pull out the pin or screw to which the chain was fastened, in consequence of which the boat was forced from the shore, the mules and fore-wheels of the wagon being in the boat and the hind wheels

remaining out, and as the boat left the shore, the weight of the hind part of the wagon drew the wagon and mules into the river, the driver being on the fodder in the wagon, and the driver and one of the mules were drowned. It appears that the ferry-man called to the driver to jump into the boat, or into a flat-boat which was near, and which he could easily have done, but being alarmed, he jumped into the river; and that he would not have been drowned if he had remained in the wagon on the fodder. The evidence tended to show that the pin by which the boat was held to the landing was loose and unsafe, and that that was the cause of the accident, the fastening of the boat being insufficient to resist the force of the descent of a loaded wagon down the steep hill which led to the ferry-boat, and there being nothing to show that the accident was caused by improper or unskilful driving the wagon.

It is manifest from this view of the purport of the evidence, that the plaintiff in error was sought to be made liable for the injury done to the defendant by the plaintiff's negligence in keeping his ferry-boat in such a condition as not to be safe for the transportation of such property as is usually conveyed in ferry-boats. The evidence in the case was fairly submitted to the jury, and their verdict has established that it was by the unfitness of the boat that the injury was occasioned. The only question for our determination is, whether he is liable in law for the damage.

Being the keeper of a ferry authorized by law, it was his duty to keep a good and secure boat, suitable and safe in all respects both to receive and to transport all such property and vehicles as are usually required to be conveyed across public ferries. He was bound to make all provisions which, under the circumstances and situation of the ferry, were necessary for the safe delivery and passage of such property as was offered at the ferry for transportation; and if, without fault by the other party, a loss was sustained in such property, either in receiving or transporting it safely, by reason of the insufficiency of the boat or other means which it was his duty to provide for that purpose, he is responsible for the injury. It was as much a part of his duty to make provision for the safe reception of property,

as for its safe transportation when received; and if the boat was unsafe and insufficient in that respect, he is liable for losses occasioned to passengers in consequence of it. He is held to strict diligence and skill in the performance of his duty; and the fact that the boat was forced from the landing by the descent of the wagon, *primâ facie* showed carelessness and negligence on the part of the plaintiff in error, and throws upon him the burden of proving that the accident was not occasioned by his fault. *Stokes* v. *Saltonstall*, 13 Pet. 181; Story on Bail. § 601, 602.

Another objection taken to the judgment is, that the plaintiff in error was not liable for the loss of the slave, because slaves, being intelligent beings, capable of volition and locomotion, cannot be brought under the rule applicable to mere inanimate property; and, consequently, that the strict law in relation to common carriers does not apply in relation to them. This doctrine is held in the cases of *Boyce* v. *Anderson*, 2 Pet. 150, and *Clark* v. *McDonald*, 4 McCord, 223. These were cases where the slaves were placed upon steamboats for transportation, and the courts hold that in such cases they are to be regarded rather as passengers than as coming under the strict rules applicable to mere chattels, in the absence of a special contract. But although it is held that the strict rule in relation to common carriers does not apply to such cases, still it is held that the party is responsible for a loss caused by his negligence or unskilfulness, and that that question is to be submitted to the jury; and this would justify the verdict in this case.

But we do not think that the principle upon which these cases turn is applicable to the circumstances of this case. The question there was, whether the carrier used proper diligence in taking care of the slaves committed to his charge, not whether the boat was unsafe and insufficient for the transportation of the slaves, in consequence of which, without fault on their part, they were lost. That is the question here; and we think it clear, that where the loss has been occasioned by the apparent negligence of the party in providing safe and sufficient means to perform what he has undertaken to the public, he comes within the rules applicable to common carriers, whatever may

be the kind of property lost by his default, provided it be such property as it was his duty to transport.

The last ground of error to be noticed is, that there was no proof that the mule lost was the property of the defendant in error. It was in the possession of his slave driving his wagon, and that was sufficient presumptive evidence that it was his property. But it does not appear that the jury took the mule into consideration in their verdict, for the damages assessed were not more than the value of the slaves, as proved, with interest.

We are of opinion that the judgment is correct, and it is affirmed.