## PATTON–TULLY TRANSP. CO. v. TURNER et al. CLARK v. PATTON–TULLY TRANSP. CO. FREEMAN v. SAME.

(Circuit Court of Appeals, Sixth Circuit. December 7, 1920.)

Nos. 3374, 3420, 3421.

1. **Shipping ☞204—Derrick boat a "vessel," within limited liability statute.**
   A derrick boat, carrying a derrick used for loading logs from the river bank upon boats for transportation in interstate commerce, *held* a vessel within the meaning of the limited liability statute (Rev. St. § 4283 [Comp. St. § 8021]), and a suit for limitation of the owner's liability for explosion of the boiler used to operate the derrick within the admiralty jurisdiction.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Vessel.]

2. **Seamen ☞29(2)—Negligent failure to keep vessel in safe condition renders owner liable for resulting injury.**
   The duty to use reasonable care in keeping a ship and her appliances in safe condition is a continuing duty resting upon the owners during a voyage and is nondelegable, and for injuries resulting from its breach the owners are liable to seamen, even if there is an entire lack of that privity or knowledge which will deny to the owners their right to limit their liability.

3. **Seamen ☞29(2)—When unseaworthiness is contributing cause.**
   Ir the unseaworthiness of the vessel was a contributing cause of injury to seamen, without which it probably would not have happened, it does not affect the owner's liability that negligence of members of the crew developed this unseaworthiness into action and made it destructive, when it would otherwise have been harmless.

4. **Seamen ☞29(2)—Owner held negligent in failing to keep vessel in seaworthy condition.**
   The owner *held* chargeable with negligence in permitting the fusible plug in the crown sheet of the boiler of a derrick boat to be replaced by a hard metal plug, which remained for a considerable time when the boiler was leaking and the injector was in defective condition.

5. **Shipping ☞208—Defect held not with privity or knowledge affecting limitation of liability.**
   Defective condition of the boiler of a derrick boat, due to the replacement of the fusible plug in the crown sheet by those in charge with a nonfusible one, in consequence of which the boiler exploded, killing several men, *held* not with the privity or knowledge of the owner, which prevented limitation of his liability, where the boiler was properly equip-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ped with a fusible plug when sent to the work, and extra plugs were provided for use as needed, and so far as appeared the boiler was in proper condition when last inspected by the owner a few weeks before the explosion.

**6. Shipping ⬅208—Negligence is not privity or knowledge, affecting limitation of liability.**

Negligence on the part of the owner of a vessel does not necessarily constitute privity or knowledge of unseaworthiness, which will deprive him of the right to a limitation of liability.

**7. Admiralty ⬅21—State death statutes enforceable in admiralty.**

A court of admiralty may award damages against the owner of a vessel for the death of a seaman thereon, where such right of action is given by the statutes of the state where the death occurred and by those of the state where the vessel belongs.

**8. Seamen ⬅29 (4)—Owner not liable for death of seaman through own negligence.**

There can be no recovery against the owner of a vessel for the death of the master and fireman through explosion of the boiler, which was due solely to negligence for which both were chargeable.

**9. Admiralty ⬅21—Law of home state held to govern death on vessel.**

Liability for the death of seamen, killed by explosion of a boiler on a boat, the home port of which was in Tennessee, and which, when absent therefrom, was employed in interstate commerce, *held* governed by the statute of Tennessee, although the deaths occurred in the waters of Mississippi.

**10. Limitation of actions ⬅118(2)—Filing claims in admiralty "commencement of action."**

Filing of death claims in a suit for limitation of liability *held* the "commencement of actions," within the meaning of the statute of limitations.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commencement of Action.]

**11. Seamen ⬅31—May recover for effects lost in explosion.**

Seamen *held* entitled to recover for personal effects lost through an explosion on the vessel.

Appeal from the District Court of the United States for the Western Division of the Western District of Tennessee; John E. McCall, Judge.

Petition of the Patton-Tully Transportation Company for limitation of liability. Petitioner appeals from a decree denying such limitation as to the claim of Robert Turner, administrator, and others, and Lizzie Clark, administratrix, and Edward Freeman, administrator, appeal from disallowances of their claims. Decree reversed, and case remanded.

Thomas M. Scruggs, of Memphis, Tenn. (H. B. Anderson and C. N. Fox, both of Memphis, Tenn., on the brief), for petitioner appellant.

W. P. Biggs and L. H. Graves, both of Memphis, Tenn. (Lee M. Russell, of Jackson, Miss., H. H. Rodgers, of Louisville, Miss., and Charles L. Rice, on the briefs), for various claimants and cross-appellants.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. The Patton-Tully Company was the owner of what was called a derrick boat, used in loading logs upon the

deck of the barges by which the logs were transported on the Mississippi river to the company's sawmill at Memphis. The derrick was operated by steam power. While the boat was in the state of Mississippi, the boiler exploded. The master and the fireman and four of the crew were killed, two were hurt (one of those hurt also losing some personal property), and the boat was sunk. It was raised and taken to Memphis, and the Patton-Tully Company filed in the court below, in admiralty, its petition for limitation of liability under R. S. § 4283 (U. S. C. S. § 8021). The two surviving members of the crew and the representatives of all those killed appeared and filed proofs of claim and answers to the owner's petition. The answers denied the existence of admiralty jurisdiction, insisted that the explosion was the result of negligence by, or with the consent of, the owners, and asked that the petition should be dismissed. The court below sustained the jurisdiction, found that the owner was not entitled to a limitation of liability, and that liability existed in favor of all claimants excepting the representatives of the master and the fireman, and directed a reference to assess damages. The commissioner's report, pursuant to this reference, was later made and confirmed. The Patton-Tully Company and the representatives of the master and fireman appeal.

The question of liability centers around the fusible plug in the crown sheet of the boiler. This boiler was provided, as is quite common, with four devices which pertained to safety from explosion. Two were for the information of the fireman, through his observation or use of them in the performance of his duty. These were the glass water gauge, which indicated the height of the water in the boiler, and gauge cocks in a vertical row shortly above the crown sheet, by trying which he could ascertain where the water level was, as to each one which he tested. The other two safety devices were intended to be automatic. One was the usual safety valve, which normally comes into frequent use during operation, and without any attention by the fireman relieves the steam pressure, if it becomes too high. The last was the fusible plug. A hole was drilled and suitably threaded in the crown sheet in its center and highest point. Into this was screwed a threaded plug of a metal which would melt as soon as the water disappeared from the upper side, and the steam in the boiler would be blown down through the opening, extinguishing the fire. It was familiar knowledge that, as soon as all the water above the crown sheet was turned into steam, the crown sheet could and would become overheated, perhaps red hot, and if then water were pumped into the boiler and came into contact with this hot metal it would flash into steam, making an increase of steam pressure which might be too great and too sudden for the safety valve to take care of, and an explosion would follow. Prior to this accident, the master and the fireman had inserted in this crown sheet opening an iron or steel plug, and the absence of the fusible plug which had formerly been in position was undoubtedly one of the efficient causes of the explosion.

[1] 1. *The Jurisdiction.* In the trial court, the crew—the death and damage claimants—insisted that the derrick boat was not a structure pertaining to navigation; in other words, that the injuries were not mar-

itime torts, and hence that there was no admiralty jurisdiction. The owner insisted to the contrary. The ultimate action of the District Court having been favorable to the crew, they lost interest in their jurisdictional objection and do not mention it in this court. Even the administrators of the master and fireman, who were denied recovery, do not touch this question in their assignments of error. On the other hand, the owner now suggests, rather than urges, to this court that there was no jurisdiction in the court below.

The question whether this derrick boat, situated as it was, should be treated as appurtenant to the land or to the navigable water impresses us as close. In Cope v. Vallette Dry Dock Co., 119 U. S. 625, 630, 7 Sup. Ct. 336, 30 L. Ed. 501, it was held that a floating dry-dock was not within the admiralty jurisdiction, though doubtless it was capable of being towed from place to place and might be used for transporting the apparatus and appliances which constituted its permanent cargo. In The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236, it was decided that admiralty had jurisdiction over an injury by a floating vessel to a permanently fixed beacon. Many of the cases are cited and reviewed by Judge Cochran in Barnes Co. v. One Dredgeboat (D. C.) 169 Fed. 895, and by Judge Rellstab in Berton v. Dry Dock Co. (D. C.) 219 Fed. 763. The derrick which this boat carried was a loading apparatus, and especially intended to take logs from the bank and deposit them upon an adjacent boat. The machinery was of the type commonly found upon permanent wharfs. From the cases cited, we assume (without expressly deciding) that a wharfboat or floating wharf, carrying this type of loading machinery, but firmly moored to the land, would be outside the maritime jurisdiction, even though it was contemplated that it might, on occasion, be towed to another location; and we likewise assume that a barge carrying similar machinery, but customarily moved about a harbor and transferring cargo from one vessel to another, would be within that jurisdiction. It is at least not clear in which class this particular derrick boat should be placed, considering what the record shows and fails to show as to its capacity and uses; but we think the question suggested becomes immaterial in this case. The derrick boat was, at this time, undoubtedly in service as an instrumentality of interstate commerce, and if the Limited Liability Act is intended to reach such a boat, constitutional basis for that result is found in the commerce clause, even if it might not be in the admiralty and maritime clause. Providence Co. v. Hill Co., 109 U. S. 578, 589, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038. Is, then, a boat like this within the intended scope of the Liability Act?

Section 4283 reaches "any vessel." It was the theory of the act that always when a vessel was on a voyage between ports, and commonly until its return to the home port, the owner would have scant opportunity for personal control, and therefore ought to be relieved from the full effect of the respondeat superior rule. This theory applied with lessened force to ordinary vessels upon inland lakes and rivers, and with little, if any, force to the class of quasi vessels which often remain in or about one harbor and have no propelling power—barges, lighters, etc. Accordingly, section 7 of the original act of 1851 (R. S.

269 F.—22

§ 4289 [Comp. St. § 8027]) provided that the act should not apply "to the owners of any canal boat, barge or lighter, or to any vessel of any description whatever used in river navigation." In 1886, either because the original theory of the act had not justified section 7 or from a change in the theory, this section was amended so as to direct that the liability limiting provisions "shall apply to all sea-going vessels, and also to all vessels used on lakes or rivers or inland navigation, including canal boats, barges and lighters," U. S. C. S. § 8027. This last-quoted language is therefore controlling upon the present question. In a certain broad sense, all these floating structures, including even floating dry docks, are vessels; but it is accurate enough to say that they constitute a general class, which may be called quasi vessels, and which is divided into subclasses by more specific nomenclature. Under the general and familiar rule of construction, "expressio unius," etc., specific classes, not enumerated, would be excluded; for example, a dredge or pump boat is not a canal boat, and not within the ordinary definitions of a barge or lighter, and we have not seen decisions that undertake to classify such a boat under this section of the statute.

This derrick boat was not a canal boat, nor, in the ordinary sense, a barge. It did at least closely approximate a lighter. A lighter often has lifting means for elevating cargo, though it commonly transfers cargo from the shore to itself, and then from itself to the ship, instead of directly from the shore to the ship, as here. There is not much inherent distinction, nor apparent reason for excluding this from the statute and including ordinary lighters. Both are directly essential to the transportation of freight by water, while the connection therewith of (e. g.) a dredge, is more indirect and remote.

Upon the whole, we conclude that the lack of jurisdiction to proceed under this statute as to this derrick boat is not so clear that we ought, practically on our own motion to decline to proceed. See In re Eastern Dredging Co. (D. C.) 138 Fed. 942; The Sunbeam (C. C. A. 2) 195 Fed. 468, 115 C. C. A. 370.

The first reading of section 4283, as now printed, suggests doubt whether a boiler explosion is an "act, matter or thing, lost"; but the explanation found in Butler v. Boston Co., 130 U. S. 527, 549, 550, 9 Sup. Ct. 612, 616 (32 L. Ed. 1017), makes it clear that there is a misprint, and that it should be construed as if it read "act, matter or thing, loss, damage," etc.

[2] 2: *Liability.* It must be taken as clearly settled that if the explosion was due solely to the negligence of the fireman in permitting the water to get too low, or in starting the injector when the water was too low, there is no liability in favor of the seamen injured. The mere operating negligence even of one in authority does not create liability; and this rule has not been changed by the statute declaring that the one in authority is not a fellow servant of the seamen under him. Chelentis v. Luckenbach Co., 247 U. S. 372, 384, 38 Sup. Ct. 501, 62 L. Ed. 1171.

It is equally clear that there is liability if the injuries result from lack of original seaworthiness (s. c., 247 U. S. 381, 38, Sup. Ct. 503 [62 L. Ed. 1171]); and we think it is the proper inference from the prin-

ciples stated in the opinion just cited as well as from the discussion in The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760, that the duty to use reasonable care in keeping the ship and her appliances in safe condition is a continuing duty resting upon the owners during the voyage, that this is nondelegable, and that, for injuries resulting from its breach, the owners are liable to the seamen, even if there is an entire lack of that privity or knowledge which will deny to the owners the right to limit their liability.

[3] We do not find this to be expressly decided in cases which are later than, and recognize the rule of, The Osceola; but it had often been held prior to The Osceola. The Osceola seems to accept these holdings as right, when based on a failure to maintain the ship or appliances in seaworthy condition, and there is close analogy to the common law nondelegable duty of maintaining a safe place to work. Globe Co. v. Moss (C. C. A. 6) 245 Fed. 54, 59, 157 C. C. A. 350. Of course, if the unseaworthiness was a contributing cause of the injury, without which it probably would not have happened, it makes no difference in the owner's liability that the negligence of these of the crew developed this unseaworthiness into action, and made it destructive when it would otherwise have been harmless. Kreigh v. Westinghouse Co., 214 U. S. 249, 257, 29 Sup. Ct. 619, 53 L. Ed. 984.

[4] Proceeding to this question of fact, whether the master used reasonable care in maintaining the boat's appliances in seaworthy condition, we conclude that he did not. It is strenuously urged that the fusible plug did not pertain to the seaworthiness of the boat, that the water gauges and try cocks were all the appliances necessary to complete safety, and that the fusible plug was only the means of avoiding the fireman's possible negligence in using the devices which of themselves answered every requirement of safety on the theory that the operator would do his duty. We cannot accept this view as controlling. It appears that such plugs were in very common use; that they were required by the federal regulations (although this particular kind of boat was not within the regulations); and one of the witnesses for the boat gave the expert opinion that they were essential to safety. However, the case does not rest on this alone. The injector was in bad order, and was likely to fail to operate unless assisted, and the boiler was leaking. These conditions had continued for some time, and they must have been known to the master. In light of their existence, the office of the fusible plug as a safety device was emphasized. We think that to substitute a permanent for a fusible plug in a boiler, where it was abnormally difficult to maintain the proper water level, was a failure to exercise reasonable care to keep the boat in seaworthy condition, and that, therefore, the owners and the boat were liable for the explosion to which this combination of leaky boiler, defective injector, and nonfusible plug contributed.

[5] 3. *Limitation.* Was this lack of seaworthiness with the knowledge or privity of the owners? It is conceded that, if we are to accept the conception that this boat was on a voyage from her home port, she was in proper condition when she left the port of Memphis some two years before. The boiler was in all respects in good condition, there

was a fusible plug in position, and there was a supply of additional plugs on board to be used in case of necessity. We doubt vary much whether the "knowledge or privity" of the owners can be measured by the boat's condition when she left Memphis; the general manager of the company could be in almost daily communication with the boat, if he wished, and, in fact, he made frequent visits of inspection. He had been upon or around the derrick boat for several days about five weeks before the accident; but this is not important, because there is no evidence tending to show that any appliance was not then in good condition. There was direct evidence to the contrary, which we see no reason for discrediting; and hence there can be no denial of the right to limit liability, except upon the theory that the unseaworthiness developed after this visit of inspection, and that the owner (and, in this case, this must mean the general manager) had knowledge of it. The District Judge found that these conditions existed; but, while this finding is entitled to great weight, we are unable, upon this record, to accept it.

It is not very important where the burden of proof technically rests, because, where the ship was in good condition when last under the owner's personal control, there is the common presumption that such condition continues until the contrary appears. Save surmise from the fact that they put in a permanent plug, there is nothing to show that the supply of fusible plugs on board had been exhausted, and this surmise is not persuasive. There is nothing tending to show knowledge by the manager of the lack of fusible plugs, if there was a lack, or that a permanent one had been inserted, or that the injector was not working well. There was evidence tending to show a letter saying that the boiler was leaking, and asking that some one be sent to fix it; but this did not suggest the lack of fusible plugs, which is to be taken as the essential element in constituting unseaworthiness, and it does not appear that there should have been any apprehension of explosion from the mere fact that the boiler was leaking to an extent so slight as not to prevent its use.

The Supreme Court early laid down the proper rule for the application of this limiting liability statute. It said, in Providence Co. v. Hill Co., 109 U. S. 578, 588, 3 Sup. Ct. 379, 386 (27 L. Ed. 1038):

"If the courts having the execution of it administer it in the spirit of fairness, with a view of giving the shipowners the full benefit of the immunities intended to be secured by it, the encouragement it will afford to commercial operations will be of the last importance; but if it is administered with a tight and grudging hand, construing every clause most unfavorably against the shipowner and allowing as little as possible to operate in his favor, the law will hardly be worth the trouble of its enactment."

[6] In the same case, it is pointed out (109 U. S. on page 602, 3 Sup. Ct. 395, 27 L. Ed. 1038) that "privity or knowledge by the owners is quite a different thing from their neglect," and that there may be neglect on their part which will not deprive them of their right to limitation.

We conclude that there was neither privity nor knowledge on the part of the owner, as to the lack of the fusible plug, and hence that the owner is entitled to limitation of liability.

[7] 4. *Liability for Death.* Under the maritime law, unaided by statute, as under the common law, negligently causing death does not give rise to liability in favor of the estate of the deceased person or his surviving kin (The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358); but where one ship wrongfully inflicted an injury, causing the death of one upon another ship, and the injury was inflicted on the high seas, and while both ships belonged in a state the laws of which gave an action for wrongful death, it was held that the right of action thereby given could be enforced in any proper court of admiralty (The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264). It was later held (Southern Pac. Co. v. Jensen, 244 U. S. 205, 37 Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900; Chelentis v. Luckenback, supra) that a state statute establishing a general code of liability for injuries as between master and servant would not be enforced in admiralty as between owner and seamen. It may be urged with some force that, in The Hamilton, the state statute was accepted because it was not inconsistent with any code of maritime law, but was rather supplementary to the already existing liability in damages for such an injury, for, if the injury had been of a degree not resulting in death, admiralty would have required no aid from the state statute to give redress.

On the other hand, it may be contended that, in the Jensen Case, the state compensation act was rejected, because, as between master and servant—owner and seaman—there was an existing code of maritime law, which denied indemnity for negligence, with which code the compensation act was inconsistent, and so, by analogy, that a death act is also inconsistent with the maritime code of duties and liabilities of the owner and seaman—even more inconsistent than the compensation act —because it imposes an extreme liability where there was none, instead of a greater liability where there was already some. However, we are not satisfied to limit the application of The Hamilton in this way. The whole theory of a cause of action for death was foreign to admiralty, by The Hamilton a state death act was recognized, and the reason suggested why there should be one rule when the offending ship was the seaman's own, and another when it was not his, does not appeal to us as convincing. In Thompson Co. v. McGregor, 207 Fed. 209, 124 C. C. A. 479, we enforced in admiralty a death act in favor of a seaman (though the question just suggested was not raised and the Jensen Case had not been decided).

Since this explosion took place within the state of Mississippi, and the boat belonged in Tennessee, and both states have death acts, it follows that the court below might lawfully award damages for the death of a seaman, if the facts justified.

[8] 5. *The Master and the Fireman.* From the proof, it must be assumed that either the master or the fireman had inserted this permanent plug, and that the other one had either participated or approved, and that, for at least a week or two after its insertion, both had continued its use without objection. It is not important whether the applicable state law abolishes the defense of assumption of risk, or whether such a regulation would reach the admiralty courts. However that may be,

there are sufficient reasons why neither the representatives of the master nor of the fireman can recover.

The master carried the responsibility for the insertion of this plug. Either he directed it, or, having power to prevent, he permitted it. It must be treated as if it were his act; but there cannot be liability by the owner to the master to keep the boat safe against the master's own negligence. The same act by the master, which made the boat liable to the seamen because his act was the owner's act, cannot make the boat or the owner liable to him. As between him and the owners, his act is his, not theirs. No liability reaches the owners in favor of the seamen, except through the master as a conduit; and he cannot be the conduit of his own wrong for his own benefit. In the common relation of master and servant, we cannot suppose that the rule of respondeat superior makes the master liable *to the servant* for whose negligent act the master must (as to others) *respond*.

Liability as to the fireman might well be denied on the same theory as that just stated with regard to the master; but more controlling is the fact that the fireman's carelessness in operation was surely the primary cause of the explosion. He knew of whatever degree of unsafety there was, he knew of the added duty thereby put upon him to watch the water, and he failed in that duty. On him, more than in any other one place, rests the blame for the ensuing death and destruction. He cannot be heard to say that a boiler defect, consisting only in the lack of a safeguard against his carelessness, and which defect would have been harmless, except for his negligence, was, as to him, an efficient contributing cause of the explosion.

[9] 6. *The Applicable State Statute.* It was early held, in collision and towage cases, that the statute of the state in the territorial waters of which the accident happened, was the applicable statute. City of Norwalk (D. C.) 55 Fed. 98; Robinson v. Detroit Co. (C. C. A. 6) 73 Fed. 883, 20 C. C. A. 86. In The Hamilton, supra, it was decided that, when the injury occurred upon the high seas, the admiralty courts would apply the death statute of the state in which the vessel had its home port, and this was (at least in part) upon the theory that the vessel was constructively within the jurisdiction of its home state, when that jurisdiction had not been superseded by that of another sovereignty having territorial control of the place of the accident. This court had occasion to consider somewhat exhaustively the whole subject, and to review the decisions and to reconcile some seeming conflict, in Thompson Co. v. McGregor, supra, 207 Fed. 215–219, 124 C. C. A. 479. In that case a seaman upon a lighter had been killed by the explosion of a steam boiler on its deck. The home port of the lighter was in Michigan; the explosion happened while it was in the territorial waters of Canada. By the death act of Canada, a suit which had been brought to recover damages for the seaman's death was barred by limitation; by the death act of Michigan, the suit was in time. We held that the liability of the boat and its owner for that death was given and regulated by the law of Michigan, and not by that of Canada. We distinguished the earlier towage and collision cases, because they pertained to navigation rules—a subject within the control of the local sover-

eignty; while the boiler explosion on the boat's deck had to do with the internal management and discipline of the boat, and because, for such purposes, the boat remained a part of the territory of its own state.

We are not able to distinguish Thompson v. McGregor from the present case. The facts are, for this purpose, identical, except that the conflict of laws there suggested was between Michigan and Canada, while here it is between Tennessee and Mississippi. Whatever force there is in this difference tends to confirm the adoption of the Tennessee law, since, in the Thompson-McGregor Case, the boat was, for many purposes, subject to the Canadian jurisdiction, while in the present case it is not easy to see in what substantial respect the Mississippi jurisdiction had attached so as to supersede the admiralty jurisdiction of the United States. In other words, the case is not as strong for the application of the law of the place of the accident as was the Thompson-McGregor Case.

Whenever the boat was outside of Tennessee, it was engaged in interstate commerce. Going up or down the river, it would be crossing state lines constantly. It might be difficult, if not impossible, to know in what state the boat was when some accident on board happened. It would be unfortunate if the liability of the owner to a seaman for death, or the measure of damages, changed whenever a state line was crossed.

It follows that all awards for death were made upon the basis of the statute of the wrong state, and therefore the commissioner's award upon these claims and the decree of the court thereon must be set aside and a new assessment of damages had. Under these conditions, it would not be worth while to discuss some troublesome questions presented by the attempt to interpret and apply the Mississippi statute.

[10] The proofs of claims, filed in this cause, must be treated as the commencement of actions, within the meaning of any statute of limitations.

[11] 7. *The Survivors.* We see no reason why one of the survivors should not recover for the reasonable value of clothing lost and for the amount of currency said to be lost. The question is not at all one of passenger and carrier; and, if it were of that class, there is nothing unreasonable or unusual in the conduct of one of the crew in keeping on the boat, in a trunk or on the person, the articles and the relatively small amount of money here claimed. The awards to the survivors for personal injuries and for property lost are not to be disturbed, except as they must go only against the fund.

The decree is reversed, and the case remanded for further proceedings.