## THE OMAR D. CONGER.

### In re PORT HURON & SARNIA FERRY CO.

(District Court, E. D. Michigan, S. D. September 18, 1924.)

#### No. 6760.

**1. Shipping ⬌203—Limitation of liability statute to be liberally construed.**

The limitation of liability statute (Comp. St. § 8021 et seq.) is to be fairly and liberally construed to carry out its purpose to encourage shipping and shipbuilding.

**2. Shipping ⬌209(3)—Explosion of vessel's boiler held to warrant inference of unsafe condition or negligent management.**

The explosion of a vessel's boiler, under the rule of res ipsa loquitur, warrants the inference that it was either in unsafe condition or was improperly managed.

**3. Shipping ⬌207—Owner of vessel held entitled to limitation of liability for damages caused by explosion of her boiler.**

Where a steamer had recently been thoroughly repaired, inspected, and a certificate of seaworthiness issued, and the evidence clearly showed that her boiler, at the time it exploded, was sound in material and condition and properly constructed, and that the engineer and

fireman in charge were competent and experienced, and it was the opinion of competent experts that the explosion was caused by negligently permitting the water to get too low and suddenly injecting cold water onto an overheated surface, the corporation owner *held* entitled to limitation of liability.

In Admiralty. In the Matter of the libel and petition of the Port Huron & Sarnia Ferry Company, as owner of the steamer Omar D. Conger, for limitation of liability. Limitation granted.

Warren, Cady, Hill & Hamblen, of Detroit, Mich., for petitioner.

Henry Baird and Moore & Wilson, all of Port Huron, Mich., for claimants.

TUTTLE, District Judge. This is a libel and petition filed by the Port Huron & Sarnia Ferry Company for limitation of its liability as sole owner of the steamer Omar D. Conger. The petition is opposed by various claimants, who have filed claims for damages herein, based upon personal injuries, property damage, and loss of life alleged to have been caused by negligence of the petitioner, resulting in the boiler explosion hereinafter referred to. Petitioner is a Michigan corporation engaged in the operation of a line of ferries between Port Huron, Mich., and Sarnia, Ontario, and the steamer Conger was one of the vessels used by petitioner in that service.

On Sunday afternoon, March 26, 1922, the Conger was lying at her wharf in the Black river, Port Huron, Mich., about 50 feet above the dock at which the ferries take on and discharge passengers, preparatory to going on her regular run at 3 o'clock, when, at about 2:20 o'clock, her boiler exploded. As a result of this explosion, the four members of the crew on board at the time were killed, her upper works demolished, her hull badly damaged, and she sank at her dock in Black river, a total loss.

The force of the explosion was such that the entire boiler was lifted out of the vessel and dropped, practically intact, except as split by the explosion, on the roof of a house some 200 feet away. Other portions of the vessel and its equipment were carried inshore a considerable distance, in some instances as much as two city blocks, doing a large amount of damage to property, and injuring several persons on shore. It is to limit its liability for the loss, destruction, damage, and injury resulting from and in connection with this explosion that the petitioner has filed this libel and petition.

[1] Under the provisions of the federal Limited Liability Act (Comp. St. § 8021 et seq.) applying to vessel owners, the shipowner is given greater protection than one who carries on business under the strict rules of common law. In the absence of privity or knowledge on his part as to a condition likely to be the cause of disaster, without his taking proper steps to prevent it, or his personal negligence in connection therewith, he is entitled to limit his liability to the value of the ship after the accident, and the freight pending, if any. This right to limit liability upon the part of the vessel owner, as I understand it, is for the purpose of encouraging shipbuilding and the employment of ships in commerce and navigation, and consequently the act is to be construed fairly and liberally, in such manner as to carry out the purposes for which it was enacted. Providence & New York Steamship Co. v. Hill Mfg. Co., 109 U. S. 578, 3 Sup. Ct. 379, 617, 27 L. Ed. 1038; People's Navigation Co., Inc., et al. v. Toxey et al., 269 Fed. 793 (C. C. A. 4). In the present case, however, even though the privileges conferred by this statute were to be held strictly within its letter, I should feel bound to find that the petitioner herein had complied with all requirements necessary to enable it to take advantage of the relief which the statute offers.

[2] In Rose v. Stephens, etc., Transp. Co. (C. C.) 11 Fed. 438, involving the explosion of a ship's boiler, the court said:

"In the present case the boiler which exploded was in the control of the employés of the defendant. As boilers do not usually explode when they are in a safe condition and are properly managed, the inference that this boiler was not in a safe condition, or was not properly managed, was justifiable, and the instructions to the jury were correct."

This decision has been followed in a number of cases, among the most recent of which is that of The Rambler, 290 Fed. 791, 1923 A. M. C. 618 (C. C. A. 2).

Applying the rule of "res ipsa loquitur" as laid down in those cases, to the testimony in the case under consideration, it is apparent that the Conger's boiler exploded either because it was unseaworthy, or because it was improperly managed, or because it was both.

[3] The first question to be considered, therefore, is that of unseaworthiness, although the lack of it would not bar limitation of liability, if it were without the privity or knowledge of the owner. Patton-Tully Transp. Co. v. Turner, 269 Fed. 334 (C.

C. A. 6). The claimants concede on the record that the vessel as to her hull was in all respects sufficient and seaworthy, so that our inquiry relates entirely to the condition of her boiler. It appears from the evidence that the Conger on December 7, 1921, was taken off from her run to undergo season repairs and to prepare her for the annual inspection. She was taken to the Wolverine dry dock, where the vessel was inspected by the United States local inspectors of steam vessels at Port Huron, who laid out certain repairs to be made upon the vessel, including repairs to the boiler. At the time this inspection was made, the vessel's chief engineer, who was killed in this disaster, accompanied the boiler inspector, and the repairs were made under his supervision and that of the government officials. While these repairs were under way, the government inspectors visited the ship from time to time, and in the course of making such repairs the boiler was thoroughly overhauled in every particular. The repairs to the hull and boiler were completed in February, 1922, and on February 11th of that year the government inspectors completed their inspection, and on February 13, 1922, issued to the vessel her certificate, good for one year from that date. It is the undisputed testimony of the United States local inspector of boilers, and of the boiler makers who did the work, that when the vessel's certificate was issued on February 13, 1922, the Conger's boiler was in every way a seaworthy and sufficient boiler, and I so find the fact to be.

We therefore start out with the fact that the vessel was seaworthy in every particular at the time her certificate was issued on February 13, 1922. We next come to the question as to whether there was any change between that date and the time of this disaster affecting the seaworthiness of the Conger's boiler.

The vessel returned to her run between Sarnia and Port Huron on February 18, 1922, and continued on that run until 11 p. m. Friday, March 24, 1922. It appears from the evidence that on Friday evening, March 24th, the fireman complained that there was a leak in the boiler, regarding which be notified the engineer and the master. The master accordingly made an examination, and, ascertaining that such was the fact, he directed that the ship's regular engineer, who was to return from his vacation the following day, be notified. The regular engineer directed that the fires be drawn and that the Pioneer Boiler Works

be requested to send down their men the following morning, namely, Saturday, March 25th.

On the morning of Saturday, March 25th, Mr. Campbell, the ship's regular engineer, along with the boiler makers from the Pioneer Boiler Works, examined the boiler and found that a stay bolt on the port side was leaking, that three tubes were leaking, and that a number of others showed signs of having leaked. The local inspectors' office was notified that repairs were being made, and the engineer, with the boiler makers, went over the boiler, tightening up the stay bolt in question, and likewise rolling and beading all tubes that were leaking, or showed signs of having leaked. On completing their work on Saturday afternoon, the boiler makers and the engineer went through the boiler, making a careful inspection for the purpose of ascertaining if everything necessary had been done. It is the undisputed testimony of the boiler makers that, when they completed the repairs on Saturday afternoon, March 25th, there was nothing defective or out of repair in connection with the boiler, and that it was in every way sufficient and seaworthy. That evening the fires were lighted under the boiler, and during the night it was looked after by the dock watchman, an experienced fireman. It is his testimony that when he left the ship at 6 o'clock Sunday morning, March 26th, the boiler was not leaking and that there was nothing in any way the matter with it.

On Sunday afternoon, March 26th, at about 2:20 o'clock, as the vessel lay at her dock, ready to go upon her run, the boiler exploded, resulting in the damage previously mentioned.

As all of the men in charge of the boiler room of this vessel on the day of the explosion, and such of the deck force as were aboard, were killed in the disaster, what transpired in the Conger's boiler room between the time the watchman left on Sunday morning and the explosion in the afternoon will never be known, except as it may be deduced from the condition of the boiler after the disaster and the known facts existing prior thereto. We know, from the testimony of the boiler makers who made the repairs the day previous and from the night watchman who left the boiler at 6 a. m. the day of the disaster, what the facts were as to the condition of the boiler and the manner in which it was working up to within 8 hours of the explosion. We have the testimony of boiler experts as to the con-

dition of the boiler after the disaster, as noted in their examination of it, and their opinion as to the cause of the explosion, based on such condition. From their testimony, coupled with that of the boiler makers and the night watchman, no other conclusion can be drawn than that the Conger's boiler at the time it exploded was seaworthy, and that the explosion was due to negligence in its management, either on the part of the engineer or fireman, or both.

The Conger's boiler, when it exploded, was lifted bodily out of the ship, carrying away the steel beams and decks above it, and finally landing on a house almost 200 feet away. All of the experts testify that this fact in itself shows the boiler to have been of ample strength and in a seaworthy condition. It was their experience that boilers which are defective do not cause an explosion of the great violence which this one did, but rather that they give way at the weakest point, and remain to all intents in their original position. After the explosion the boiler was carefully examined for defective material by the United States local inspector of boilers, the various parts were measured, both as to thickness and weight of metal, and calculations were made, based on such measurements. It is his testimony that there was no defective material in the boiler, and that his calculations, based upon the measurements made by him, showed that the boiler, both as to construction and as to material, was in excess of the requirements called for by the government regulations. The boiler was 20 years old at the time of this disaster, which is not old as marine boilers go, and it is undisputed that it had been well maintained, that it was a boiler of an approved type and manufactured by an approved concern.

Placing the burden on the petitioner, of establishing the seaworthiness of the Conger's boiler at the time of the loss, I do not discover anything in this record that would justify me in reaching the conclusion that after the issuance of the government certificate in February, some 5 weeks before this disaster, the boiler became unseaworthy. In fact, there is nothing even in the remotest degree indicating that this boiler became unseaworthy or that it was unseaworthy at the time it exploded. The stay bolt which was found to be leaking was tightened, and when the boiler makers left was in perfect condition. The same situation applies to the tubes. All of the testimony shows that the leaks were not serious, and that it is nothing unusual for a boiler tube to leak,

even one that is new. The proof fully indicates that any leaks in the tubes or elsewhere about the boiler were fixed on the Saturday before the disaster, and fixed properly, and there is nothing in this record, either as to its condition on the Saturday before the explosion or as to its condition after the explosion, that in any way points towards this unfortunate occurrence having resulted from any unseaworthiness or insufficiency in the Conger's boiler, and I find that it did not.

Now, as to the cause of this explosion, the testimony is also in harmony. From the evidence of eyewitnesses, one of whom was on the bridge of another vessel not over 100 feet away, it came suddenly and without warning; the first that was noticed was when the air was filled with flying débris. That it had terrific force is fully evident from the distance the boiler was carried, the condition of the ship after the disaster, and the distance inshore that various portions of the ship and its equipment were thrown. The vessel's safety valve was but a year old, and had been working properly at all times, and it is entirely evident that the force which caused this disaster was so great that the ordinary appliances on a boiler designed to care for excess steam could not possibly afford the relief required.

In the examination of the boiler after the explosion, effort was made to ascertain the cause, if possible. We have in this connection the testimony of boiler experts, including the government inspector, as to the appearance and condition of the metal, the appearance of the tubes, and the manner in which the boiler was torn at various points. From their evidence, and the opinions advanced by them and by the representative of the American Bureau of Shipping, a witness of long experience in boiler work and highly qualified as to boiler explosions, who testified in connection with same, it is clearly evident that this disaster was caused by low water in the boiler and the sudden injection of cold water onto an overheated surface.

The evidence in connection with this point, coupled with that bearing on the condition of the boiler when the repairs were completed the day before, is such that the only conclusion to be drawn is that the boiler was seaworthy at the time of the explosion, and that the explosion was caused by negligence and mismanagement on the part of either the engineer or fireman, or both, and I so find the fact to be.

We now come to the question of the com-

petency of the crew of this vessel and of the boiler makers who made the repairs. Under the facts in this record, it is established that the petitioner delegated to the master and engineer of each vessel the duty of looking after repairs to same and of keeping the vessel, both as to hull, machinery, and equipment, in a seaworthy condition. It further appears, in connection with repairs to the Conger's boiler, that the duty of making such repairs and the supervision thereof was intrusted to the chief engineer of the ship, and that petitioner relied upon the chief engineer and the Pioneer Boiler Works making such repairs in a proper manner. As was said in The Annie Faxon (C. C. A. 9) 75 Fed. 312, at page 315, 21 C. C. A. 366, 369:

"When we consider the purpose of the law which is under consideration, and the construction that has been given to it by the courts, it is obvious that the managers of a corporation whose business is the navigation of vessels are not required to have the skill and knowledge which are demanded of the inspector of a boiler. It is sufficient if the corporation employ, in good faith, a competent person to make such inspection. When it has employed such a person in good faith, and has delegated to him that branch of its duty, its liability beyond the value of the vessel and freight ceases, so far as concerns injuries from defects of which it has no knowledge, and which are not apparent, to the ordinary observer, but which require for their detection the skill of an expert."

Mr. Benedict, in the fourth edition of his work on Admiralty (section 536, p. 365), states the rule as follows:

" * * * And where the owner has delegated power to a shipmaster or other servant, and has relied upon him to see to it that the vessel was properly equipped or otherwise fitted for the contemplated service, the burden of proving the competency of such servant for the work intrusted to him rests upon the owner, and must be shown affirmatively before the owner can limit his liability. But if the owner has selected a proper person to perform such duties, and such person has neglected his duties, and the owner is unaware of the neglect or of the defective condition arising therefrom, he may limit his liability."

The law, then, as I understand it, is that, where a corporation has used due diligence to employ competent men to perform the tasks assigned to them, and has secured such men, even though the disaster be as a result of the negligence of the men employed, the owner is nevertheless entitled to limit its liability, in the absence of any privity or knowledge on its part as to such negligence.

Taking up first the competency of the Pioneer Boiler Works and the boiler makers employed by it, who made the repairs at the time of the annual inspection and on the Saturday before this disaster, I find that both the Pioneer Boiler Works and the men in question were entirely competent and qualified to do the work for which they were engaged. The testimony is that the Pioneer Boiler Works is a company with an excellent reputation, and that its employees, and particularly the ones who worked upon the Conger's boiler, were experts in their line. In fact, proctors for claimants conceded on the record the qualifications of these men.

I likewise find from the testimony that the crew of this vessel both as to the deck and engineer's department, the master, the engineer who supervised the repairs, and was in charge at the time of the explosion, and the fireman on watch at such time, were all competent men, fully qualified to perform their respective duties. All the testimony indicated that the engineer was a careful, competent man of long experience. The fireman on watch on the day of this disaster had been employed by petitioner for a number of years. He bore a good reputation as a fireman and was regarded by witnesses not in the employ of the petitioner, as competent, and in fact qualified to take the examination for a government license as marine engineer. I therefore find that the men employed by petitioner to operate this vessel and to supervise and make repairs to the hull and boiler, were competent, qualified men, and that the petitioner has fully complied with the requirements of the law in that regard.

Proctors for claimants have urged that the fact of the explosion establishes incompetency on the part of the engineer and fireman of this ship. Such proposition I cannot accept. The most competent person at times may be negligent, and it is well settled that incompetency cannot be proved by a single act of negligence. Further, the record of these men, and the reputation which it is shown they bore, is such that, while they may have been negligent on this occasion, it must be found that they were competent to do the work for which they were engaged.

I should also mention the testimony of the two passengers placed on the stand by

claimants, who were on the Conger on her last trip Friday evening, March 24, 1922. It is not suggested to me by proctors for claimants how I can use that testimony, nor do I see any way in which it can be made applicable to this case. They testified that on the last trip the vessel seemed to be going slower than usual, particularly as she approached the dock, and that as she went alongside her dock she had a pronounced list. While these passengers have my complete confidence, and I feel that they were telling the truth as to how the facts appeared to them, I do not see that their testimony in any way changes the situation in this controversy. Neither of them were experienced in maritime matters, nor did either of them know anything about the reason for the particular speed on that occasion. It would not be anything at all unusual for a vessel to come into a dock slowly, nor for it to have a list at such a time. We all know that here on the river, where the ferryboats dock with their sides along the wharf, every one goes toward the gangway as the ship is approaching the dock, and that it is customary and usual for the ship to list in that direction. So, as I say, I do not see anything in their testimony suggestive or helpful in any way, and the counsel who put them on the witness stand has not so urged.

There has also been some testimony about the gauge cocks and that they were found stopped up when the boiler was examined after the explosion. There has likewise been some testimony about the soft plugs. All this testimony I have considered in making my findings. The watchman who took care of the boiler the night before this disaster testified that, before he left on Sunday morning, he blew out both the water column and water glass, and that both were working. He also testified that he tried some of the gauge cocks, and that they were working. When the vessel's certificate was issued to her on February 13, 1922, or five weeks before this explosion, the gauge cocks, water column, and water glass were clean and working properly. It is the duty of the engineer and fireman to keep them clean and to test them regularly. If they failed to do so, that would be negligence on their part, as to which the owner would, under the evidence in this case, be entitled to limit its liability. Whatever their condition may have been when the boiler was taken out of the débris of the house on which it landed, which burned thereafter, we do know, from the testimony of the fireman on duty the Saturday night preceding this disaster, that the parts of the boiler designed to show the height of the water were working.

Nor is there anything in relation to the soft plugs which in any way deprives petitioner of its right to limit liability. The soft plugs in question were new at the time the vessel's certificate was granted by the United States local inspector in February, and it is the inspector's testimony that they complied in every way with the government regulations. There is nothing in the testimony in any way indicating that the condition of the soft plugs changed during the intervening five weeks, nor is there anything indicating that an inspection of the soft plugs during such a time was required. The soft plugs were new and were proper soft plugs, and, if for any reason they failed to function in the manner for which designed, there is nothing in this record which in any way shows fault upon the part of the petitioner in connection therewith, or that they were defective in any way. Furthermore, the engineer and boiler makers went through the boiler the day before the disaster, and if there was any negligence with reference to inspection of the soft plugs, such negligence was that of the men employed to repair the boiler, and not of the petitioner itself.

I am fully mindful that there are important rights involved in this case, but unfortunate as this disaster was, yet under the facts I must find, as I have found before in this opinion, that the Conger's boiler was seaworthy and sufficient, both at the conclusion of the annual inspection and on the day of this explosion, and that the disaster was not occasioned by unseaworthiness, but rather by negligence or mismanagement in its operation on the part of the engineer or fireman. I must also find, from the evidence, that the men employed by petitioner, both to repair and to operate the boiler, were competent and qualified. There is nothing in the record in any way indicating that petitioner was guilty of negligence, either in the upkeep of its vessel or in the employment of its men, or that it could in any way be charged with privity or knowledge as to any negligence on the part of its employees; on the contrary, the evidence fully shows that petitioner has complied with all the requirements laid down by the statute as a condition of enjoying its benefits.

That the steamer Conger is liable for the damage resulting from this explosion nec-

essarily follows from the findings as to its cause, namely, negligence on the part of those employed in the operation of the vessel's boiler; but, having fully met the burden of showing that the loss was occasioned without any privity or knowledge or negligence on petitioner's part, the right to limit liability is established. Accordingly, an interlocutory decree, limiting the recovery of claimants herein to the value of the remnants of said steamer now in the possession of the trustee, may be entered. As, since the opinion of the United States Supreme Court in the case of Richardson v. Harmon, 222 U. S. 96, 32 Sup. Ct. 27, 56 L. Ed. 110, the right to limit liability for damage occasioned on shore as a result of a marine disaster has been well settled, the decree will apply to all persons claiming injury as a result of this explosion.