## HENSON v. FIDELITY & COLUMBIA TRUST CO.

### No. 1205.

District Court, W. D. Kentucky.
Aug. 9, 1932.

On Rehearing Sept. 10, 1932.

Woodward, Hamilton & Hobson, of Louisville, Ky., and Odie Duncan and B. S. Morris, both of Henderson, Ky., for libelant.

Worsham & King, of Henderson, Ky., for libelee.

ANDREW M. J. COCHRAN, District Judge.

This is a proceeding in admiralty under section 183, 46 USCA (Rev. St. § 4283) for limitation of liability. It is before me on the petitioner's exceptions to the special master's report, to whom the issues therein were referred to hear the evidence and make findings, whose findings were adverse to him, and for final decree. The petitioner operates a ferry across the Green river in the highway between Owensboro and Henderson, which, at this point, divides the counties of Daviess and Henderson, the former being on the east and the latter on the west, known as Hambleton's Ferry. The ferry consists of a barge operated by a motorboat. On December 6, 1929, the decedent Bennett McGee was driving a truck for J. C. Fisel & Co. of Louisville, Ky., from that city to Henderson going west. He had in the cab with him his wife, the decedent Henrietta McGee, and his son, the decedent Robert Lee McGee, 4 years of age. He drove the truck from the Daviess county side on to the barge, and was transported to the other side. As he was leaving the barge, the chain by which it was tied to the bank broke, the barge backed from under the truck, and the truck itself backed into the river. All three of the occupants of the cab were drowned. The petition seeks to limit the liability of the petitioner, the owner of the ferry, for their deaths to the value of the barge and motorboat, appraised at $1,500. This is not a case for the application of the statutory provision relied on. It applies only when the owner of the vessel is sought to be made liable for the fault of some person other than himself. In such case the liability is to be limited to the value of the vessel and earned freight if such fault is without his "privity or knowledge." Here the petitioner is sought to be made liable, not for the fault of some person other than himself, but for his own fault. The owner of a vessel owes to the passengers thereon the duty of exercising reasonable care to see that the vessel is in a reasonably safe condition, i. e. that it is seaworthy, and if he fails personally, i. e., not through some employee, to exercise such care, and by reason thereof a passenger is injured, he is liable for the entire damage caused thereby. He has no right of limitation of his liability in such case. As to the duty of the owner of a vessel in this particular this was said in the case of Patton-Tully Transp. Co. v. Turner (C. C. A.) 269 F. 334, 338. "It is equally clear that there is liability if the injuries result from lack of original seaworthiness (Chelentis v. Luckenbach S. S. Co., 247 U. S. 381, 38 S. Ct. 503 [62 L. Ed. 1171]); and we think it is the proper inference from the principles stated in the opinion just cited as well as from the discussion in The Osceola, 189 U. S. 158, 175, 23 S. Ct. 483, 47 L. Ed. 760, that the duty to use reasonable care in keeping the ship and her appliances in safe condition is a continuing duty resting upon the owners during the voyage, that this is nondelegable, and that, for injuries resulting from its breach, the owners are liable to the seamen, even if there is an entire lack of that privity or knowledge which will deny to the owners the right to limit their liability. We do not find this to be expressly decided in cases which are later than, and recognize the rule of, The Osceola; but it had often been held prior to The Osceola. The Osceola seems to accept these holdings as right, when based on a failure to maintain the ship or appliances in seaworthy condition, and there is close analogy to the common law nondelegable duty of maintaining a safe place to work."

To the same effect is the case of Henry

Gillen's Sons Lighterage v. Fernald (C. C. A.) 294 F. 520.

In the case of Stewart v. United States (D. C.) 25 F.(2d) 869, 870, it was said: "The law is that the owner owes a nondelegable duty to furnish a seaworthy vessel, and is liable where the injuries result from lack of original seaworthiness."

The petitioner owed this duty to the decedents, passengers on his ferry, and the question is whether he personally breached it, and, if he did, whether such breach was a proximate cause of the deaths. It is the personal fault of the petitioner that is in issue. The matter of the fault of any other person is not necessarily involved. Hence it is that the authorities cited on behalf of the petitioner as to the application of the statute referred to have no bearing here.

The particular in which the defendant claims that the petitioner personally breached this duty was in the chain which he provided for tying the barge to the bank, the breaking of which was the direct cause of the disaster. It claims that the chain was unsafe and that the petitioner himself failed to exercise reasonable care in seeing that it was reasonably safe. The links in the chain were made out of five-eighths soft steel and were 6 inches in length. It was made about 5 or 6 months before by a negro blacksmith in the neighborhood. The blacksmith was old enough to be called "Uncle" and he had followed his craft for 40 years, 35 of which were on his own account. His father before him had been a blacksmith. His reputation as a skilled and competent blacksmith was good. The links were formed by welding the steel by heat supplied by the usual blacksmith's furnace. His method was to make two links and then make a third link connecting the two. The giving away of the chain was due to one of the links parting where it had been welded. The weld was a bad one. It may be said that it was a very bad one. Its two ends were held together by a slight connection at the outer edge, which does not seem to have gone all the way around. It is the petitioner's claim, and he so testified, that the defect in the link could not be detected by a visual inspection. There is evidence on behalf of defendant that it could. But the case will be disposed of on the basis that it could not— that as to such inspection it was a hidden defect. The petitioner made no test as to the safety of the chain. He did no more than give it a visual inspection. He testified that upon its delivery to him, and before he used it, he so inspected it, and this he did a number of times thereafter, the last time being about 15 days before the accident.

The question which the case presents is whether this is all that reasonable care required of him or whether he should not have subjected it to some test that would have determined its safety. A master owes his servants the duty of exercising reasonable care to provide him with reasonably safe appliances with which to work. This duty is said to be performed if he purchases the appliances from a reputable manufacturer. In 39 C. J. p. 424, it is said: "Where a master purchases simple or common tools from a reputable manufacturer he need not make inspection thereof to ascertain their fitness for use although where the instrumentalities so purchased are not of such character he is required to use reasonable care and to inspect the same, but he is not guilty of negligence for his failure to discover latent defects."

According to this, he owes no duty of testing the appliance so purchased. He need not even inspect it. He has the right to take it for granted that it is not defective, having purchased it from such a manufacturer. Here the petitioner did not purchase the chain in question from a reputable manufacturer. He purchased it from a reputable blacksmith, who had himself made it. Does the principle referred to apply to such a case? There is a difference in the two cases that may make it inapplicable. I think it may be said to be a matter of common knowledge that a manufacturer of chains tests them so as to determine what strain they will bear, and he can furnish the purchaser of a particular chain with information as to just how much strain it will stand; i. e., its factor of safety. An ordinary blacksmith is not supplied with such means of testing the safety of a chain. This is the best possible means of testing its safety. It puts it to the test. In view of this difference, it may be that a purchaser of a chain from a reputable blacksmith by a master for the use of his servants owes him the duty, not only of inspecting it, but of subjecting it to such tests for determining its safety as he may have at hand, and that in the matter of inspection he should use a magnifying glass in aid of his eyes.

But this case does not involve the duty of a master to his servant in the matter of appliances but of the carrier to his passengers. A carrier owes to his passengers a higher degree of care than a master owes to his servants. The care which a carrier owes his passengers is said in the case of Pennsylvania

Co. v. Roy, 102 U. S. 451, 26 L. Ed. 141, to be "to observe the utmost caution characteristic of very careful, prudent men" and to exercise "extraordinary vigilance aided by the highest skill." As to its liability for injuries caused by a defective appliance purchased from a reputable manufacturer, it has been held that it is liable for the negligence of the manufacturer in the construction of the appliance, even though it has not been guilty of a failure to exercise the high degree of care required of it. It was so held in the cases of Morgan v. Chesapeake & O. R. Co., 129 Ky. 731, 112 S. W. 859; Id., 127 Ky. 433, 105 S. W. 961, 15 L. R. A. (N. S.) 790, 16 Ann. Cas. 608; Dibbert v. Metropolitan Inv. Co., 158 Wis. 69, 147 N. W. 3, 148 N. W. 1095, L. R. A. 1915D, 305, Ann. Cas. 1916E, 924.

Such is the law in New York and California. This position shows how far the courts holding it will go in making a carrier liable to a passenger for an injury caused by a defective appliance. It practically makes him an insurer. Of course, such a case would be one for the limitation of liability under the statute in case of a vessel carrier. But this is not the position of the majority of the courts as appears from the notes to those two cases in L. R. A. (N. S.) and Ann. Cas. Those courts, however, do hold the carrier in such cases to a high degree of care in inspecting and testing the appliances which have been purchased from reputable manufacturers. The matter is thus put in 10 C. J. p. 954:

"The duty of the carrier as to furnishing materials and appliances originally safe, suitable and adequate is discharged by a purchase thereof from a competent and reputable manufacturer and an inspection to detect defects discoverable by any tests which the highest degree of care and prudence can suggest and hence will not be liable for injuries resulting from hidden defects which could not be discovered and provided against in the exercise of such care and prudence. A carrier is not liable for latent defects which could not be discovered by the most careful and thorough examination and certainly is not liable for latent defects of such a character that no degree of skill, care and foresight could detect their existence. Thus it has been held that a carrier is not liable for defects in a car wheel not discoverable by the usual and proper tests."

According to this, it is not sufficient that the carrier has purchased the appliances from a "competent and reputable manufacturer." Having done so, he has no right to take it for granted that it is not defective. A visual inspection of the appliance will not answer. He must use "tests which the highest degree of care and prudence can suggest." He must make a "most careful and thorough examination." If this is the rule where he purchases the appliance from such a manufacturer, how much more is it so if the purchase is from a reputable blacksmith who is not equipped to test its strength. I go back then to the care exercised by the petitioner in determining the safety of the chain. He did not act on the idea that, as he had obtained it from a reputable blacksmith, he need not exercise any care whatever, but could take it for granted that it was not defective. He conceived that it was incumbent on him to exercise some care. This implies that he thought that the blacksmith was not entirely dependable. Hence he gave it a visual inspection. This is all he did. He admitted in his testimony that he knew that a magnifying glass would aid his eyes in making the inspection, but he did not avail himself of this aid. He also admitted that the safety of the chain could be tested by the use of acid, but he made no such test. It is clearly proven that the ordinary test used where chains are made in the way this one was is to hammer it when cold. By so doing, if the weld of a link is defective, its two ends will be knocked apart. He did not use this test. Nor did he inquire of the blacksmith if he did. According to the claim of the defendant, if he had so inquired, he would have found out that he did not test each link in this way. He only so tested one-third of the links. The blacksmith testified: "When I would weld two links I would take the third link and weld those two together. Everytime I would weld the link I would hammer it and see if it was good and solid before I would turn it loose."

The defendant takes it that his meaning was that he only hammered the third link. But this is not entirely clear. The fact, however, that the blacksmith may have used that test to each link, petitioner not knowing that he had, did not justify his refraining from making such test.

My conclusion is that the visual inspection of the chain by the petitioner was not the exercise of reasonable care on his part in looking after its safety, and that the finding of the special master that he failed to exercise such care is sustained by the evidence. It seems to me also that it is open to say that the petitioner was negligent in failing to have two chains to meet the contingency of one of them breaking. This may be case of hind-

sight being better than foresight, but I am inclined to the view that due reflection and proper appreciation of the risks would have led him to resort to this additional precaution to prevent harm to his passengers.

It remains to consider whether such negligence on the petitioner's part was a proximate cause of the accident and, if so, the sole proximate cause thereof. The petitioner claims that it was not the sole proximate cause; that the negligence of the decedent Bennett McGee, the driver of the truck, was a proximate cause thereof also in that it contributed thereto. Possibly if he was guilty of negligence in the particular claimed by petitioner, it is open to say that such negligence on his part was the sole proximate cause of the accident. In that contingency there would be no liability on his part for the death of either decedent in that, though he had been negligent, such negligence was not the proximate cause thereof. But I do not understand the petitioner to go this far. His claim is only that the negligence of the driver contributed to the accident, not that it broke the causal connection between his negligence and it. The sole effect of such negligence on the driver's part is to affect the amount of recovery on behalf of his estate. It cannot affect the recovery on behalf of the estates of his wife and son, in that it cannot be imputed to either. In view of its effect on the amount of recovery on behalf of his estate, consideration must be given to petitioner's claim that the driver was guilty of contributory negligence. There were three witnesses to the accident: Charles Dillehay, whom the petitioner had employed to operate the ferry at a certain weekly wage for daytime work and a certain commission for work at night; Bernard Elder, 19 years old, employed by Dillehay at $1.25 per day to do the actual work of operating; and W. A. Bennett, 56 years old, a farmer who lived, and had lived all his life, about 6 miles from the ferry in Henderson county. He was and had been for 14 years chairman of the school board of that county. The accident happened about 10 o'clock in the morning. Elder was operating the ferry. Dillehay was on top of the bank on the Henderson side, and Bennett was on that side also, according to his statement just a little under the top of the bank. Both were about 150 feet away from the landing. He had come there with W. R. Duncan in a truck which Duncan was driving. It was their purpose to cross the ferry. Duncan did not see enough for his testimony as to what he saw to be of much value. Bennett testified on behalf of the defendant; Dillehay and Elder on behalf of petitioner.

According to the testimony of Bennett, there was no negligence on the part of the decedent Bennett McGee, the driver of the truck. He testified that, when his truck stopped, he got out of it and stood in front of it watching the ferry, Duncan remaining in the truck. When he first saw the ferry, it had left the Daviess side and was coming towards the Henderson side. It landed, and Elder got out of it and made the chain fast. He then opened the chain across the ferry to prevent vehicles and persons leaving it until it was proper for them to do so. He got out of the way on the upper side and motioned with his hands to the driver of the truck to come ahead. He started very slowly, and continued so moving thereafter when the front wheels of the truck struck the concrete roadway, which is 9 feet wide and 100 feet in length from the water up the hill, and started up it, the chain broke, and the ferry went back pretty fast. It was kicked out and shot back into the river. As soon as the chain broke, the driver began racing his motor and made a desperate effort to continue moving up the incline, but was unable to do so, and his truck backed into the river. He testified that his attention and vision were focused on the truck, and that he watched it all the time. He gave as a reason for so doing that he was afraid of the river because of accidents which had happened there. He was positive that his account of the affair was correct. He was no relation of the decedents and had no interest in the outcome of this litigation.

Elder gave an entirely different account of the accident and how it came about. He testified that he placed the truck a little past the center of the ferry towards the Henderson side. The ferry was 58 feet long. The distance from the center to the end was 29 feet, of which 10 feet was in the rake, leaving 19 feet in the keel. The wheel base of the truck was 17½ feet. If placed exactly in the center, there would have been 10¼ feet from the front wheels to the back end of the rake. The ferry had an apron in front of the rake 2½ feet wide. His testimony as to what took place after the truck was so started on the ferry was this. He started the motor, and, after the ferry was in motion, got out of it and collected the ferriage. In landing, the rake of the ferry ran up on the concrete and laid on it nearly its full length. After it landed, he tied it to the bank, took down the barrier chain, went to the truck, and gave the driver a receipt for the ferriage on a

piece of road map, he not having any re-ceipts because not in the habit of giving them. He then started toward the front end of the boat to watch the truck off. As he did so, the driver had his motor racing, let the clutch out or in with a jerk, which put his front wheels up on the rake. This broke the chain. He then kind of slowed up the truck, which was still rolling, and started again. This start put his front wheels on the con-crete. When this happened, the ferry began to slip back, and the further back it slipped it seemed like it would pick up a little more, and when the rear wheels went down off the ferry, they kicked it out into the river and dropped down into it. When he saw the chain break, he threw up his hand and grabbed the wire extending from one bank to the other on the upper side of the ferry, and to which it was attached and started hollering to the driver to stop and kept doing so until it was too late. When he began to holler, the truck was just starting on the rake, and he was right by the driver's side, ahead of him possibly a step. This is the account of the affair which he gave in his direct examina-tion on behalf of petitioner. I make out therefrom that, when the driver let his clutch out or in with a jerk, this caused the front wheels of the truck to jump forward from where they were on to the rake. He after-wards testified that when this movement ceas-ed those wheels were 2 or 3 feet on the rake. If at the start they were a little farther than the center of the ferry, this would make a jump of near 10½ feet, if not at least that distance.

His testimony here and that of Bennett agreed in this—that the ferry did not begin to slip back until the front wheels of the truck were on the concrete, and that it then did so because of the pressure on it of the rear wheels. On cross-examination, however, he was asked this question: "The ferry didn't begin to kick out into the river until the front wheels of the truck got on the concrete, did it?" His answer was: "Yes it scotted back some."

He was again asked: "When did your ferry begin to kick back into the river?" His answer was: "When the front wheels went off the flat."

In a further answer he said that "the boat slipped gradually until the front wheels got on the concrete enough to mash it down."

Possibly his whole testimony on this sub-ject should be taken to amount to this: The ferry slipped gradually from the time of the jerk until the front wheels got on the rake.

This put a stop to the slipping by their mash-ing the rake down on the concrete. When the front wheels hit the concrete, the rear wheels kicked the ferry back into the river. So that it is possible that there was a difference in their testimony in this particular. They did differ in this—that Elder, after tying the fer-ry and letting down the barrier, went back to the truck and gave the receipt for ferriage and then went to the front again; that there was no signal given to the driver to come ahead; that the truck started with a jerk or a jump; that it was then, and not when the front wheels of the truck struck the concrete, that the chain broke; and that Elder hollered to the driver.

There are a number of considerations which tend to weaken the force of Elder's testimony. His feelings were on the side of the petitioner, his employer. It is hard to ac-count for McGee's wanting a receipt for his ferriage. His employer had sent him to Hen-derson, and knew that he would have to pay this ferriage to get there, and not unlikely knew that petitioner was not in the habit of giving receipts and was not supplied with blank receipts. If his testimony is to be tak-en that upon the jerk the truck jumped 10¼ feet or any substantial number of feet so as to place the front wheels 2 or 3 feet on the rake, this does not strike me as likely. The truck weighed 9,500 pounds and the freight 3,500, making a total of 13,000 pounds. If his testimony is taken to be, further, that the ferry did not begin to back until the front wheels of the truck struck the concrete, this is hardly likely. If the jerk broke the chain, it is most likely that it was taut at the time, and such a force must have caused the ferry to back substantially. If it did so back, the driver must have known that it was backing as well as that the chain had broken so as to cause it to back, and there is no reason why he should not have heard Elder's hollering. It was therefore reckless for him to attempt to leave the ferry under these circumstances. There was no occasion for his so doing. He was an experienced and careful driver, and had his wife and son with him. Dillehay, who at time of the accident was on top of the bank on the Henderson side, testified that he was talking to the driver of a state highway truck with his back to the river. The truck of Duncan and Bennett was in front of the former truck. His first knowledge of the ac-cident was that he heard Elder holler "Stop," and that he wheeled and went beyond the truck in front. When he got where he could see, the front wheels of the Fisel truck were on the concrete, and he saw the hind wheels

just as they left the ferry and splashed into the water. The ferry backed to the center of the river. It was 104 yards or 312 feet across the river. The force of the kick of the hind wheels of the truck was sufficient to drive the ferry out into the river a distance of about 150 feet. His account of what took place just before and at the time the ferry was so kicked back agrees with that of Bennett. His testimony that whilst he was standing with his back to the river he heard Elder holler "Stop" tends to support Elder's testimony that something had happened before what he saw when he got in sight. But Bennett, whose attention was fixed on the truck from the beginning, testified that he did not hear Elder holler stop. The only sound which he heard was that of Dillchay saying, as he passed him, "There's a woman in the truck." Duncan also testified that he did not hear Elder holler. The first thing that he heard which roused his attention was the loud noise made by the racing of the motor of the truck in the attempt made to keep it from backing into the river. He then looked down the hill and saw the ferry going out from under the truck pretty fast. He corroborated the testimony of Dillehay that the ferry was kicked back halfway of the river. He contradicted Bennett as to his standing in front of their truck when he witnessed the accident. He could not, however, say whether Bennett was inside or outside of the truck. If he was outside, as Bennett said he was, the reasonable account of his being so was that he might witness the landing as he testified. It is immaterial whether he was exactly in front of the truck. There was testimony introduced on behalf of the petitioner to the effect that at times when trucks were driven off the ferry without a jerk, and the chain was not taut but slack, the effect of the movement was not to cause the ferry to slip back so as to tighten the chain. Experiments were made under this condition, and such was the result. At the same time experiments were made of the truck starting rapidly and with some force. In that case the chain became very taut. I am not sure just what effect it is claimed by the petitioner should be given to this testimony. It may be that he claims that it shows that the ferry could not be driven back when a truck was leaving it without a jerk, and hence corroborates Elder's testimony that McGee started his truck with a jerk. But it cannot be generalized from the instances testified to that in no case will the pressure of the rear wheels of the truck as it is leaving the ferry cause it to move back. The use of a chain presupposes that it may. And I would think that it

would always be kept taut in order to prevent any such movement. It may, however, be petitioner's position that, even if McGee did not start with a jerk, he was careless in operating the truck so as to cause the ferry to move back. I do not think that such effect can be given to it.

I have thus considered all the evidence having any bearing on the question as to whether McGee was negligent in operating the truck as he was leaving the ferry. What the case comes to is this: The burden of proof was on the petitioner to establish by preponderance of the evidence that he was. The sole evidence introduced by him tending to show this was the testimony of Elder. Against that is the testimony of Bennett. As I take it, the testimony of the two is in conflict. They cannot stand together. It is not possible to reconcile them on the basis that Elder's account is the true one. There is no other testimony and no circumstances proven tending to corroborate the testimony of Elder. There is no reason why I should accept his testimony in preference to that of Bennett. If any preference is to be shown, it should be to that of Bennett. If the testimony of the two is put upon an equality, petitioner must fail. The special master who saw the witnesses and heard them testify found that McGee was not negligent. I do not think that I would be justified in differing with him.

The only other question in the case is as to the amount of damages. Exceptions were taken to the special master's findings on this score, but they have not been argued before me, and I do not feel called on to consider this phase of the case.

The exceptions of the petitioner are overruled, and the defendant is entitled to a decree which he will prepare and submit.

### On Petition for Rehearing.

 This suit is before me on petition for rehearing filed by plaintiff. He questions the position taken by me that this is not a case for the application of section 183, 46 USCA. Possibly I can put the position more clearly than I did in my original opinion. Every carrier, by water as well as by land, owes the duty to his passengers to exercise reasonable care to provide a reasonably safe vehicle in which to carry them. This duty is an absolute one. He is bound to see that it is performed. He cannot delegate its performance to another and escape liability for its nonperformance. Such liability is for the entire damages sustained thereby. There is,

however a difference between a water carrier and a land carrier, in one particular, and that is this. The former may be entitled to have his liability limited to his vessel and earned freight, whereas the latter is never entitled to any limitation in his liability. The water carrier is entitled to such limitation when he delegates the performance of such duty to another person, and his breach thereof is without his privity or knowledge; i. e., he did not participate in, and had no knowledge of, such breach. If, however, he does not delegate the performance of the duty to another, but undertakes to perform it himself, and does not do so, he is not entitled to limitation, but is liable for the entire damages just as much so as if in the other case he participated in or had knowledge of its breach by the person to whom he had delegated its performance.

The case of The Yungay (D. C.) 58 F. (2d) 352, 356, cited by plaintiff, aptly illustrates the distinction that I am trying to make. There the injury complained of was due to defective compasses. The owner had delegated the duty of providing suitable compasses to the master of the vessel. It seems to have been claimed that he had no right to make such delegation. It was held that he had such right. The master breached this duty, and, as the owner had not participated in the breach and did not know of it, it was held that he was entitled to limitation. The court said: "Ordinarily the owner may rest his duty to make the ship seaworthy upon a suitable agent, and thus be relieved under the limitation act, where he has no notice or knowledge of the agent's negligent performance of the duty. * * * The burden of proving this lack of privity or knowledge, his own nonparticipation in the fault or negligence causing the injury, is upon the owner."

It said further: "In my opinion, the duty here could be deputed. The owner, who was not a navigator, was not obliged to study the science of navigation or acquire expert knowledge concerning his vessel and equipment before sending her out. It cannot be said that at his own peril he left the adjustment of the compasses to another."

. It said finally: "We come back to the question, the crucial one as to limitation, whether Webster [the owner] has shown that the faulty condition of the Yungay's compasses when she set forth on the voyage was without his personal participation. I incline to the view that he has. I accept as true his testimony as to inquiring of the master about the compasses and being told that the master himself would do the necessary adjusting.

"Webster apparently knew enough about ships to realize that the compasses would need adjustment after the lay up and repairs, and he put the duty of adjusting them upon the master, who held himself out as competent to do the work."

In that case, had Webster, the owner, not delegated to the master the duty of providing suitable compasses, but had undertaken to perform that duty himself, the question of privity or knowledge would not have been in the case. The sole question would have been whether he had breached that duty—had failed to exercise reasonable care in providing reasonably safe compasses for the vessel —had himself been personally negligent. If he had, he would have been liable for the entire damages without any limitation. If he had not, he would not have been liable for any damages whatever.

So here the plaintiff did not delegate to Dillehay or any other person the duty of providing a reasonably safe chain for his ferry. He undertook to perform that duty himself, and the sole question in the case is whether he failed to exercise reasonable care in so doing. If he did, he is liable for the entire damages. If he did not, he is not liable for any damages whatever. Hence it is that the sole question in this case is whether plaintiff failed to exercise reasonable care in providing a reasonably safe chain for his ferry; i. e., was negligent in so doing. The statute does not apply to the case because it only applies where liability is claimed for the negligence of another, and liability is not claimed here on this ground. Therefore the numerous cases cited where the owner was sought to be made liable for the negligence of another have no application here, and no help can be gotten from their consideration. The plaintiff in his petition for rehearing addresses himself to the question of his negligence. He considers it as having bearing on his right to limitation. It has no such bearing. Its sole bearing is on the question of liability at all. If he was negligent, he is liable to the full extent of the damages. If he was not negligent, he is not liable to any extent whatever. He seems to think that, though he may have been negligent, his liability is affected if he was not guilty of bad faith or willfulness. It is not a question of bad faith or willfulness. There is no room to claim that plaintiff was guilty of either. It is solely a question whether he was guilty of negligence. As bearing on that question, it is said that it is

shown without contradiction that shop-made chains are in general use on all ferries. I suppose reference is had to all ferries on Green river. I do not so read the evidence. According thereto, as I read it, the plaintiff is the only ferryman on that river that used such a chain. The plaintiff is the only witness who testified on this subject. He testified that he did not know any ferry on Green river that had chains like his; that principally they had something like a log chain; that his chains were as strong again and twice as big; that the sort of chains in general use on Green river were just ordinary log chains, looked more like a log chain. They were fastened to the boat, and on landing wrapped around a stake on the bank. Log chains I take to be factory made chains. The plaintiff refers to them as being sold with a guaranty. I would restate here my position as to plaintiff's negligence. He was transporting by his ferry across Green river at least seven or eight hundred machines, of which at least 35 or 40 were heavy trucks. This called for great care in the selection of the chain. The only means which he had to keep his ferry in place on landing was a single chain, and that chain was one made by an ordinary country blacksmith. The plaintiff seems to have known nothing more about him than that he had done work for him previously and his work was satisfactory.

 The evidence shows, and it is a matter of common knowledge, that chains are manufactured by reputable manufacturers who are supplied with appliances to test their safety, and there is some evidence that they are sold with a guaranty. An ordinary blacksmith is supplied with no such appliances. He can determine the sufficiency of his welding only by visual inspection and by hammering the links when cold. I think that due care on plaintiff's part required that he should have supplied himself with a factory and not a shop made chain. Having supplied himself with the latter, he should have had two chains to guard against the possibility of one of them breaking. Having only one, he should have seen to it that it was hammered when cold. There is every reason to believe that, if this test had been applied to the link which parted, its defectiveness would have been disclosed. He gave no direction to the blacksmith, Woodward, on this subject, and made no inquiry of him as to what inspection he had made or what tests he had used. His testimony as to the frequency and minuteness of his inspection indicates that he doubted the chain. The mere fact that no

defect was discovered to the naked eye was not sufficient to remove the doubt. Nor would an examination with a microscope or by acid have been sufficient. There was the possibility that the link was not welded on the inside. Hence the necessity of testing its safety by hammering when cold. In addition to this, the evidence justifies the conclusion that a proper visual examination would have disclosed the defect. It was an extremely bad weld. The evidence tends to establish that, so far as there was a weld, it was on top and not at the bottom. Six different witnesses testified that in their opinion a proper visual examination would have brought to light the defective weld. The plaintiff's testimony as to the minuteness of his inspection is not conclusive. His interest in the outcome of this litigation affects the weight of his testimony.

The petition for rehearing is overruled.