## HENSON v. FIDELITY & COLUMBIA TRUST CO.

### No. 6357.

Circuit Court of Appeals, Sixth Circuit.
Dec. 15, 1933.

Ernest Woodward, of Louisville, Ky. (Odie Duncan and B. S. Morris, both of Henderson, Ky., and Woodward, Hamilton & Hobson, of Louisville, Ky., on the brief), for appellant.

J. C. Worsham, of Henderson, Ky. (Worsham & King, of Henderson, Ky., on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

In an admiralty proceeding for limitation of liability under 46 USCA § 183, appellant was the petitioner, and the appellee as administrator a claimant for the estates of Bennett McGee, Henrietta McGee, and Robert Lee McGee, opposing in its answer the petitioner's claim to limitation under the statute. The controversy was referred to a Commissioner, whose findings and conclusions allowing the claims, assessing damages, and denying the petition, were excepted to. The District Judge, in conformity with Admiralty Rule 46½ (28 USCA § 723), also made findings of fact, and his conclusions of law resulted in a decree sustaining the Commissioner (3 F. Supp. 950), from which this appeal is taken.

The appellant operated a ferry on Green river, which separates Daviess county from Henderson county, Ky. On December 6, 1929, the decedent, Bennett McGee, driving a heavy and partially loaded truck, and accompanied by his wife and minor son, was being transported by the appellant's ferry across the river. As the truck was leaving the barge on the Henderson side, the chain which fastened the ferry to the bank parted, the ferry was pushed out to the middle of the stream by the revolving rear wheels of the truck, and the truck itself slid into the water, where all three of its occupants were drowned. The chain broke at a defective weld in one of its links. The evidence warrants the observation of the District Judge that the weld was not only bad, but very bad.

Some five or six months before the accident the appellant had ordered the chain of Woodward, an elderly village blacksmith of the neighborhood. It was made from bars of ⅝″ soft steel, its links formed by welding upon the anvil after being heated in the usual blacksmith's furnace. Woodward's reputation in the neighborhood as a competent black-

smith was good. No question is made as to the sufficiency of the material from which the chain was fabricated. Its parting was due to the defective weld. The link which failed was joined at the outer edges of the weld, but there was no union of the metal within the outer edge.

The appellant testified that he had ordered Woodward to make the strongest chain he knew how to make; that when it was delivered he inspected it carefully, and could detect no defects in it, and that both he and his ferrymen frequently inspected it thereafter. No test of the chain was, however, made by the appellant, nor did he require Woodward to make any, nor ascertain whether Woodward had facilities for testing. The appellant had purchased one other chain from Woodward. Prior to the accident neither of the chains had failed. While aware that defective welding might be discovered by the use of a magnifying glass or an acid, the appellant neither made nor required such tests to be made. An approved method of testing welded links is by hammering them when cold. Neither the blacksmiths nor ferrymen along Green river test their chains. Woodward testified that in making the chain he would first make two links, then weld a third link connecting the two, and hammer the links. It is not clear from his testimony whether such hammering was done on all of the links or upon only every third link, whether it was done when the links were cold, nor whether it was done to test the welds.

Two main questions are presented by the record: (1) Was the appellant negligent in relying upon the chain, and (2) is he entitled to a limitation of liability under 46 USCA § 183?

██ This court has said that the duty to use reasonable care in keeping a ship and her appliances in a safe condition, e. g., seaworthy, is a continuing duty resting upon the owner and is nondelegable. Patton-Tully Co. v. Turner (C. C. A.) 269 F. 334, 337; Globe S. S. Co. v. Moss (C. C. A.) 245 F. 54; Thompson Towing & Wrecking Ass'n v. McGregor (C. C. A.) 207 F. 209. See also Christopher v. Grueby, 40 F.(2d) 8 (C. C. A. 1). We assume, since it appears to be conceded, that seaworthiness comprehends, not only the condition of the vessel for the purpose of the voyage, but also the safety of the appliances by means of which passengers and freight are embarked and disembarked. The burden to show that a vessel is seaworthy is upon the owner. McGill v. Michigan S. S. Co., 144 F. 788 (C. C. A. 9).

██ But whether the duty of the appellant was delegable or not, it is clear that, in respect to the appliance here involved, he did not delegate any duty with respect to it to his employees. He himself ordered the chain and selected the blacksmith who was to fabricate it. He designated the kind and size of material from which it was to be formed, and himself inspected it before it was put to use. The chain failed, and its failure was the proximate cause of the decedents' deaths. Our inquiry must therefore be directed to the sufficiency of the precautions exercised by the appellant himself in the ordering and installation of the chain, and their adequacy must be measured, not by standards applied to all persons charged with negligence, nor by that standard of reasonable care which measures the duty of a common carrier, either by land or water to its employees, but by that higher standard of care which the law imposes upon a carrier of passengers. It has been said that the care which a carrier owes his passengers is "to observe the utmost caution characteristic of very careful, prudent men" (Pennsylvania Co. v. Roy, 102 U. S. 451, 456, 26 L. Ed. 141), which is "the exercise of the utmost human skill and foresight" (Chesapeake & O. R. Co. v. Morgan, 129 Ky. 731, 112 S. W. 859, 860), or, as was said by this court in Pennsylvania Co. v. Clark, 266 F. 182, 188, "the exercise upon the carrier's part of extraordinary vigilance, aided by the highest skill," or the "greatest and highest degree of care and caution approved by human knowledge and experience and consistent with the nature, extent and operation of its business." Memphis Street Railway Co. v. Bobo (C. C. A.) 232 F. 708, 711. See, also, Giger v. N. Y., H. & H. R. Co., 60 F.(2d) 63 (C. C. A. 2); Lehigh Valley Railroad Co. v. Ciechowski, 10 F.(2d) 82 (C. C. A. 2).

██ Measured by these standards, did the appellant exercise that degree of care which the law requires in equipping his boat with the appliance here involved? He ordered the chain from a country blacksmith. He required no tests to be made of it. He was aware that certain tests with a magnifying glass or acid might disclose weaknesses not visible to the naked eye. He made no such tests. Whether he knew that the hammering of the weld cold would disclose imperfections does not appear, but he made no effort to ascertain whether such test or any other tests were commonly used for that purpose.

There is evidence that reputable manufacturers of chains of standard sizes and quality represent their chains to be tested and guar-

anteed. It is inconceivable that the appellant, who operated a ferry for many years, during all of which time he was a purchaser of chains, did not know that such tested and guaranteed chains were to be had, or that he had never been solicited by persons making or having such chains for sale. The District Judge indicated that in his opinion there was negligence in failing to buy a factory chain, as distinguished from one made by a blacksmith. This is said to be a holding without precedent or authority that no duty of inspection exists when an appliance is purchased from one who manufactures by machinery, but that tests to discover hidden defects are required when the article is handmade by an artisan of experience and good repute. The court below did not so hold. There may still be craftsmen in some of the arts whose handmade products are superior to those produced by machine, though in this machine age the heavy industries are doubtless better served by the highly developed mechanisms of the modern factory. But the line drawn by the court below was not one between handmade and machine fabricated appliances, but a distinction between appliances which are tested and those which are not, and between producers who have facilities for making tests and those who have not. The distinction is a sound one, and without respect to the quality, otherwise considered as between handmade and machine-made products, it may well be that in a situation which involves human life, and in which the highest standard of care is applicable, that the mere selection of an untested appliance, where a tested one is available, may of itself constitute negligence.

There is more to be considered, however, in respect to the care exercised by the appellant than merely his selection of an appliance not known by him to have been tested, and it has bearing, not only upon the question of negligence, but also upon the question of limitation of liability, to be hereafter discussed. Was his selection of an ordinary country blacksmith to whom to intrust the making of a chain upon which so much must depend a complete discharge of the duty to exercise that high degree of care which a carrier owes to his passengers, and is he to be absolved from liability by the mere fact that Woodward had a good reputation as a blacksmith? Doubtless, within the ordinary requirements of his trade, Woodward was a good blacksmith of reasonable skill and experience, and it may be conceded that a chain is ordinarily a rather simple appliance. But Henson required a chain of unusual tensile strength.

He recognized this need by designating material as heavy as was consistent with manual handling, and by his instructions to Woodward to make the strongest chain he knew how to make. Henson was daily transporting automobiles and heavy trucks across the Green river. He placed his trust in a single chain. Whether this was of itself negligence, as intimated by the District Judge, we are not required to decide. But Henson knew something of the strain exerted upon a chain by the kick of a heavy truck, even when the chain is so attached to the bank as to be held taut. He must have known something of the greatly added strain put upon it when suddenly jerked while loose, as so frequently it was. In these circumstances was "the utmost skill and caution" or "extraordinary vigilance" exercised in relying upon an ordinary blacksmith, and the now somewhat primitive tools and implements of his trade? Woodward was no specialist in the fabricating of heavy duty chains. He had made but one other chain for Henson, and that one was only intermittently used to piece out a short length when need required. It is not shown that he was specially skilled in welding, or that he knew of, applied, or possessed facilities for applying recognized tests. We do not depart from the rule that shipowners are exempt from liability (other than that due to imputed negligence) when they exercise due diligence in the selection of trustworthy, experienced, and capable persons to repair and make their ships seaworthy, Pocomoke Guano Co. v. Eastern Transportation Co., 285 F. 7, 10 (C. C. A. 4); The Pontin Brothers (D. C.) 42 F. (2d) 556; Id., 47 F. (2d) 595 (C. C. A. 2), but we think appellant's conduct falls without the rule. Surely something more should have been known of Woodward's qualifications to make a chain for the heavy duty use intended than that he was a good country blacksmith. One does not usually employ the ordinary craftsman when the need to be served calls for more than average skill. In McGill v. Michigan S. S. Co., 144 F. 788 (C. C. A. 9), certiorari denied 203 U. S. 593, 27 S. Ct. 782, 51 L. Ed. 332, negligence was found in the failure of the owners to inquire as to the knowledge of their supervising engineer of the explosive qualities of gases, or his fitness to handle them. The principle there applied is applicable here.

This being a case where the standard of care to be applied is that governing common carriers in respect to the safety of their passengers, cases involving situations wherein a lesser standard is the measure of liability,

typical of which is the decision of this court in Westinghouse, etc., v. Heimlich, 127 F. 92, are of little help, and it is to be noted that the chain there involved was represented by the manufacturer to have been tested. Whether, if the appliance here considered had been so represented, good faith reliance upon such representation by the appellant would have absolved him of liability, we are not called upon to decide.

But it is urged that the chain used by the appellant was actually tested by Woodward. The testimony upon this point is not clear to us, and was not clear to the court below. The appellant seeks to dispel the ambiguity by offering to this court Woodward's belated testimony that each of the links was tested by hammering. This evidence we declined to receive in view of the appellee's stipulation that the witness would so testify. The stipulated evidence has little persuasiveness because Woodward does not even now offer to testify that he hammered the links while cold, and because, while it was clear from the opinion of the District Judge that he was in doubt about the inferences to be drawn, his supplemental opinion upon petition for rehearing clearly demonstrates that no such offer of additional evidence was by the petition made to him. Finally, the proffered evidence is completely destroyed by the proved and conceded facts. The chain failed, and the failure was due to an imperfect weld. If the testimony of the experts, who are wholly in agreement that such weld would have been disclosed by the hammer test, is to be believed, then the evidence of actual test by Woodward is certainly not to be accepted as conclusive in the face of the actual result.

The appellee likewise offers belated evidence. There is question as to whether the inference to be drawn from appellant's testimony is that other ferries on Green river were equipped with chains fashioned by blacksmiths or with machine-made chains. The appellee offers to prove that other ferries used machine products. We do not consider this evidence controlling. The prevailing practice on Green river is not conclusive. Chains have failed before, and the ancient aphorism of the weakest link is warning to the world wherein the hazard lies. It is undoubtedly sound that "the use of a standard unreasonably dangerous may constitute negligence." Kitsap County Transportation Co. v. Harvey, 15 F. (2d) 166, 168, 48 A. L. R. 1420 (C. C. A. 9). In the recent case of Johnson v. Kosmos Portland Cement Co., 64 F. (2d) 193, 196, we made an observation applicable here: "It needs no illustration to demonstrate that danger may be present although injury has not yet occurred."

We come then to the question raised by appellant's petition to limit his liability to the value of his vessel. 46 USCA § 183 (Rev. St. § 4283) reads as follows: "The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

In determining whether the appellant may avail himself of the limitation thus provided, the inquiry must be as to whether the defective appliance was or was not used on the ferry with the privity or knowledge of the owner, for "privity or knowledge by the owners is quite a different thing from their neglect," and there may be neglect on his part which will not deprive him of his right to limitation. Providence Co. v. Hill Co., 109 U. S. 578, 3 S. Ct. 379, 617, 27 L. Ed. 1038. The purpose of this section was discussed in Patton-Tully Transportation Co. v. Turner, supra, and it was there said: "It was the theory of the act that always when a vessel was on a voyage between ports, and commonly until its return to the home port, the owner would have scant opportunity for personal control, and therefore ought to be relieved from the full effect of the respondeat superior rule. This theory applied with lessened force to ordinary vessels upon inland lakes and rivers. * * * Accordingly, section 7 of the original act of 1851 * * * provided that the act should not apply 'to the owners of any canal boat, barge or lighter, or to any vessel of any description whatever used in river navigation.'" In Richardson v. Harmon, 222 U. S. 96, 32 S. Ct. 27, 30, 56 L. Ed. 110, Mr. Justice Lurton declared: "Thus construed, the section harmonizes with the policy of limiting the owner's risk to his interest in the ship in respect of all claims arising out of the conduct of the master and crew, whether the liability be strictly maritime or from a tort nonmaritime, but leaves him liable for his own fault, neglect, and contracts." And this was approved and followed in Pendleton v. Benner Line, 246 U. S. 356, 38 S. Ct. 330, 331,

148

62 L. Ed. 770, wherein Mr. Justice Holmes declared: "The statute does not limit liability for the personal acts of the owners done with knowledge."

It must be clear that the fault here complained of is directly that of the owner, and not that of his master or crew. He ordered the chain, and selected the one who was to make it. He made his own inspection, and the appliance was installed and used at his direction. If it resulted in the unseaworthiness of his vessel it was original unseaworthiness and not a condition which developed after the ship left his immediate control. We have considered carefully the cases which hold that the limited liability statute should not be cut down from its intended effect by too easy a finding of privity or knowledge on the part of the owners. Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631; Pocomoke Guano Co. v. Eastern Transportation Co., 285 F. 7 (C. C. A. 4); American Warehouse Co. v. Davison, 240 F. 126 (C. C. A. 2). But we do not find in these cases any support for the application of the limitation where privity is clear, or where the fault or omission is specifically that of the owner, rather than of any member of his crew. With Mr. Justice Holmes: "We very much appreciate the danger that the act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners, as also by too liberal an attribution to them of contracts as personally theirs. We are not disposed to press the law in those directions further than the cases go." Capitol Transportation Co. v. Cambria Steel Co., supra. We have here, of course, no question of contract as was there involved, but the fault is too close to the door of the owner for us to ignore the condition upon which his right to limitation is expressly based, both in tort and for breach of contract. The petition for limitation of liability must be denied.

■ Some question was raised in the court below as to the contributory negligence of the driver of the truck, and the excessiveness of the awards. These questions are not here pressed. As to the first, it could only affect liability for the death of the driver, and would be of no avail in so far as recovery was had for the deaths of his wife and child. As to both questions, however, there were findings by the Commissioner, approved by the court. While the court did not see the witnesses, the Commissioner did. We see no reason to depart from the rule that the findings of the Commissioner sustained by the court will not be reversed unless clearly wrong. The Yale (C. C. A.) 58 F.(2d) 974; Northern Navigation Co. v. Minnesota, etc. (C. C. A.) 49 F. (2d) 203; Baltic Cotton Co. v. United States (D. C.) 50 F.(2d) 257; Id. (C. C. A.) 55 F. (2d) 568.

The decree below is affirmed.