ELLIS, Judge.
This suit arose out of an accident which occurred on the afternoon of May 15, 1957 whereby Mrs. Marguerite Brown Gunter, wife of plaintiff, when driving an automobile on the free ferry owned and operated by the Department of Highways, State of Louisiana, somehow ran into the chain barrier which gave way and her car continued the length of the disembarking ramp and thence into the river and she and her guest passenger were drowned.
From the record, it appears that plaintiff and his wife were the owners of a 1954 Chevrolet Sedan with standard gear shift; that two days prior to the accident the Chevrolet was damaged in a collision and Hatton Packard Co., Inc. had loaned to plaintiff and his wife a 1951 Packard with automatic transmission. It was shown that prior to the accident Mrs. Gunter had driven automobiles with automatic transmissions and that each day preceding the accident she had driven the Packard. Plaintiff, the husband of Mrs. Gunter originally instituted suit against the State of Louisiana through the Department of Highways; its public liability insurer, Travelers Insurance Company; and Hat-ton Packard Company Inc. On an exception of no cause of action the suit against the State was dismissed, and plaintiff voluntarily dismissed his suit against Hatton Packard Company, Inc., stipulating that Traveler’s Insurance Company’s liability was limited to $10,000.
From a judgment in the trial court awarding plaintiff $5,000 for the loss of love, affection, and companionship of his wife, and $1,306.22 funeral expenses, defendant has prosecuted this appeal.
The ferry in question had a deck length of 60 feet. At each end was a 16 foot apron or ramp to afford entrance to the ferry from the river bank and exit from the ferry to the river bank. These aprons were adjustable upward and downward as might be required by the water level in the river. On the wes* bank of the *33 river, from which Mrs. Gunter boarded the ferry, there was a barricade gate approximately 17 feet from the apron. Sim Leader, the operator of the ferry, and the only employee thereon, testified that he opened the gate and permitted Mrs. Gunter to drive on to the ferry, and that she appeared to be driving carefully. He continued to stand at the gate and permitted two following cars to proceed forward. He testified that he was standing with his back to the ferry and about 100 feet from the scene of the accident; that he heard the noise when the Packard struck the chain, looked around and saw the car plunge into the river. He took a pike pole which was a part of the ferry equipment, and went to the end of the ferry from which the car had plunged, but found the car had drifted too far away and was too deeply submerged for him to reach it with the pole.
The evidence shows that the ferry did not carry a lifeboat. There is conflicting testimony as to whether it was equipped with life preservers. Some of the passengers requested the operator to move the ferry to the submerged car. He testified that he considered this request but concluded such a maneuver might add to the peril of the ladies in the car rather than afford them relief.
The occupants of the second car behind the Packard were Casey E. Martin, Leslie A. Willie, and Raymond Willie. They agreed that Mrs. Gunter drove slowly on to the ferry. Martin placed her speed as that of a man walking, or about 4 miles per hour. Neither heard any acceleration of the motor of the Packard. Each said its front wheels went off the ferry, it swayed for an instant and then plunged into the river. All the witnesses said the car was completely submerged about 30 seconds after it hit the water. Martin testified he observed glass from the windshield on the ferry and skid marks about 3 feet from the end of the ferry.
The chain heretofore mentioned as serving as a barricade at the end of the ferry ran between two stanchions or posts placed 11 feet apart and about 1 foot from the end of the ferry. Each stanchion was equipped with an eye bolt made of iron or steel five-eighths of an inch in diameter. The chain was made of iron or steel with a diameter of one-half inch. It was attached to the eye bolt in the stanchion to the driver’s left by means of a hook on the end of the chain. It was supposedly permanently attached to the eye bolt in the stanchion on the driver’s right. This had been accomplished by placing the end link of the chain in position on the five-eighths inch iron rod to be fashioned into an eye bolt, heating the iron rod and bending it around until it formed an eye or circle. It was not welded at the point where the end of the rod rested against the rod at the completion of the circle.
Herman Eliser, another operator of the ferry, though not on duty at the time of the accident, testified that only one of four eye bolts was welded, and that the one on Mrs. Gunter’s right, the one involved in this suit, was not welded.
The impact of the car against the chain straightened the unwelded eye bolt attached to the stanchion on the driver’s right, and the chain, of course, became detached from the stanchion.
The learned trial judge, in his written reasons for judgment was of the opinion that there was negligence in the operation of the ferry due to the inadequacy of the chain barrier. He was further of the opinion that such negligence was the proximate cause of the accident.
We are in accord with the trial judge’s finding that there was negligence in the operation of the ferry. It is clear that the operators of ferries are held to a high degree of care in transporting passengers and vehicles. Further, they are under an obligation to provide barriers of sufficient strength to safeguard vehicles from improvidently going off the end of the ferry. This protection includes instances where automobiles may not be *34 under proper control, but does not apply to every conceivable situation. The law, as succinctly stated in the case of Bordelon v. State, La.App.1952, 59 So.2d 231, 239, is:
“In each of the above cases the ferry involved was a common carrier. Such is not the situation in the instant case for it is unquestioned that no fares were charged passengers or vehicles * * *. See 9 Am.Jur. Carriers, Section 4-11. The distinction, however, seems relatively unimportant in view of the standard of care and duty imposed by our courts upon those using a conveyance by invitation. The Supreme Court in Ross v. Sisters of Charity of Incarnate Word, 141 La. 601, 603, 604, 75 So. 425, L.R.A.1917F, 260, had under consideration the liability of the owner of a passenger elevator. It said: ‘While the owner of a passenger elevator operated in a business building for carrying passengers up and down may not be a carrier of passengers in the sense that he is bound to serve the public, yet his duty as to protecting the passengers in his elevator from danger is the same as that applicable for the carrier of passengers by other means, and he is bound to do all that human care, vigilance, and foresight can reasonably suggest under the circumstances, and, in view of the character of the mode of conveyance adopted, to guard against accidents and injuries resulting therefrom; and a failure in this respect will constitute negligence rendering him liable. He owes the same duty to those who by invitation, express or implied, are transported in the cars of such elevator, to exercise the highest care, in view of the character of the mode of conveyance adopted, as to the safety of the car and all appliances.’
“The rule so stated has application here and furnishes a measure of the degree of care imposed upon the defendant herein.
“The purpose of the barrier is, of course, to safeguard vehicles from improvidently going off the end of the barge. The operator of a ferry, whether public or private, is under obligation to provide barriers of sufficient strength to afford protection to property and passengers. This protection embraces instances when an automobile may not be under adequate control, but does not apply to every conceivable condition. In the instant case we think that the defendant’s duty was to provide such barriers as were necessary for the safe transportation of passengers and property, but not' to furnish appliances of a character to safeguard against casualties not reasonably to be anticipated. 36 C.J.S., Ferries, § 28.”
We also take the liberty of citing as the additional law applicable and to be used as a guide in arriving at a decision in the case at bar, the following, to-wit:
13 C.J.S. Carriers § 676:
“Carrier as Insurer. A carrier of passengers is liable only for injuries to them caused by its negligence, and is not an insurer of the safety of passengers.
“The general rule, as stated in Corpus Juris, which has been approved, is that a carrier of passengers is not as absolutely liable for the safety of the passengers as a carrier of goods is for the safety of the goods; but it is liable only for injuries to passengers which are caused by its neglig'ence in failing to exercise the proper degree of care, skill, and diligence for such passengers’ safety, as explained infra §§ 677, 678, and, therefore, although it has been said that the line of demarcation between the highest degree of care, as explained infra § 678, and insurance is not easy of description, the carrier is not an insurer of the safety of passengers, in the sense in which a carrier of goods is said to be an insurer of the safety of the goods, as stated supra § 71, and hence is not liable for injuries caused by an accident which an exercise of the proper degree of care, skill, and diligence could not anticipate or prevent, as stated infra §§ 678, 697.”
*35 13 C.J.S. Carriers § 678:
“Statements of Degree of Care Required.
“a. In General
“A common carrier of passengers should exercise such a degree of care, skill, and diligence for the safety of its passengers as is required by the nature and risk of the undertaking, in view of the mode of conveyance and other circumstances involved. This has been held to require ‘a high degree of care,’ ‘the highest degree of care, skill, and diligence,’ ‘the highest practicable care,’ or ‘extraordinary care and caution.’ ”
36 C.J.S. Ferries § 28:
“c. Care as to Passengers and Goods Generally.
“A public ferryman must exercise the care required of a common carrier as to passengers and according to the generally accepted rule as to property which he transports.
“ * * * In accordance with principles discussed in Carriers §§ 676-712, a ferryman, although a common carrier of passengers, is not an insurer of their safety, but is held to exercise of the highest degree of care and foresight in the protection of their lives and persons. A ferryman who fails in his duty to exercise due care in respect of either passengers or property will be held responsible for resultant damage, although he will be relieved of responsibility where he has not failed in such duty. Negligence in operation may consist of a number of concurring elements, no one of which in itself is sufficient to establish actionable negligence. It is not necessary that the ferryman should have had notice that a failure to take certain precautions would ■result in accident, if the possibility of its happening was clear to the ordinarily prudent mind, and he is chargeable with knowledge that automobiles may not be, at all times, under adequate control, although the ferryman is under no duty to inspect each car or as it comes aboard to ascertain whether its brakes and other machinery are in good working order. Where the accident is an extraordinary one that could not reasonably have been anticipated as resulting from the ferryman’s alleged negligent act, the ferryman is not liable * * *
Alford v. Bisso Ferry Co., La.App., 161 So. 368, 373:
“(2) It will thus be seen that the burden remains upon the carrier to show that it was free from any negligence which might have caused the accident, and, having shown this, it is not required to go further by showing how and why the passenger was injured. The rule, as thus clarified in the Cusimano case [Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376], was approved in Mays et al. v. Southwestern Gas & Elec. Co., 174 La. 368, 140 So. 826. In Bacon v. New Orleans Public Service, Inc., 18 La.App. 96, 137 So. 213, 215, 866, this court said:
“ ‘Our courts have also held that, where a passenger brings suit against a carrier to recover damages for personal injuries, all he need prove is that he was a passenger on the car and that he was injured. It is then incumbent on the carrier, in order to relieve itself of liability, to prove either that it was not negligent, or that the passenger was contributorily negligent.’
“The burden of proof, then, rests upon defendant, not necessarily to show how and why the injury occurred, but to show at least that it was caused through no negligence of defendant, or to show affirmatively that plaintiff was contributorily negligent * * *
36 C.J.S. Ferries § 28.
“e. Equipment and Appliances
“A ferryman is under a duty to provide his boat with such equipment as is nec *36 essary for the safe transportation of passengers and property, but need not furnish appliances of a character to safeguard against casualties not reasonably to be anticipated.
“A ferryman must equip his boat with such appliances as are necessary to secure the safety of passengers and property in transportation, such as barriers and mooring appliances, and the sufficiency of the equipment and its installation will be measured by the high standard of care imposed on a common carrier. It is not necessary that the ferryman should have had notice that his failure to provide safeguards would result in accident, if the possibility of accident should have been foreseen. However, the ferryman need not equip his boat so as to prevent abnormal casualties of a character not reasonably to be anticipated * * * ”.
36 C.J.S. Ferries § 28, Footnote 30:
“Miss. — Richards v. Fuqua, 28 Miss. 792, 64 Am.D. 121, 25 C.J. p. 1079 note 59.
"Duty of inspection
“(1) Owner of ferry could not merely rely on previous safe use of ferry chain when disembarking occupants of truck.— Henson v. Fidelity & Columbia Trust Co., C.C.A.Ky., 69 F.2d 778, denying rehearing 68 F.2d 144, which affirmed, D.C., 3 F. Supp. 950.
“(2) Visual inspection of chain made by blacksmith which broke when truck was being driven off ferry was held not exercise of reasonable care.- Henson v. Fidelity & Columbia Trust Co., D.C.Ky., 3 F.Supp. 950, affirmed, C.C.A., 68 F.2d 144, rehearing denied 69 F.2d 778.”
36 C.J.S. Ferries § 28:
“g. Contributory Negligence
“Contributory negligence of a ferry user may bar his recovery. The ferryman’s. rules and existing customs are relevant to the issue of contributory negligence although not necessarily controlling.
“A passenger may assume that the ferryman has performed his full duty toward him in the maintenance and operation of the boat, in the absence of circumstances putting him on guard, and if he conducts himself as a reasonably prudent man would under the circumstances, he will not be held guilty of contributory negligence. However, if, acting on the assumption of the ferryman’s full performance of his obligations, the passenger still conducts himself without a reasonable degree of care under the circumstances, and if his negligence contributes to his injury, he cannot recover against the ferryman. Nonperformance of a ferryman’s obligation to the passenger does not relieve the passenger from the duty of exercising proper care, under circumstances showing the passenger’s knowledge of existing conditions.
* * * * * *
“Proximate cause. To constitute a defense available to the ferry operator the negligence of the ferry user must have contributed proximately to the damage sustained, and the defense is unavailable where the negligence of defendant was the sole proximate cause of the damage.”
36 C.J.S. Ferries § 28, Footnote 85:
“Tex. — Bean v. Hinson, Civ.App., 235 S.W. 327; Va. Chesapeake Ferry Co. v. Cummings, 164 S.E. 281, 158 Va. 33, 82 A.L.R. 790, 25 C.J. p. 1079, note 68(a).
“Operation without barriers. (1) In a case where, but for the owner’s effort to make his mules pull the hind wheels of his wagon back on the ferryboat without the ferryboat being fastened to the bank, the wagon would not have dragged the mules into the water and drowned them, but the accident could also have been avoided had the ferryman equipped his boat with end gates, stay chains, bumpers, or other means of preventing animals being transported from backing off the boat, it was held that defendant’s negligence in operating his boat without such means for preventing accidents was the direct cause of the accident, *37 for which he was liable. Tex. — Bean v. Hinson, Tex.Civ.App., 235 S.W. 327.
“(2) Ferry operator’s negligence in failing to provide or use proper barriers and appliances was held sole proximate cause of death of plaintiff’s intestate when automobile was driven overboard, as against contention that plaintiff’s intestate was con-tributorily negligent in not timely stopping car. Va. — Chesapeake Ferry Co. v. Cummings, 164 S.E. 281, 158 Va. 33, 82 A.L.R. 790.”
It is clear that under the jurisprudence the operators of the ferry are held to “a high degree of care”, “the highest degree of care, skill and diligence”, the “highest practicable care,” or “extraordinary care and caution,” for the safety of its passengers, and where the facts reveal a failure on the part of the ferryman to exercise such care in respect of his passengers, he will be held liable for their injury or death. In exercising the degree of care required, the ferryman is also chargeable with knowledge that automobiles may not be, at all times, under adequate control, and he is under a duty to furnish appliances of a character to safeguard against casualties reasonably to be anticipated. Of course, the passenger may be guilty of contributory negligence which is also a proximate cause of the accident, but in either case, the burden of proof is upon the ferryman to relieve himself of liability by proving either that he was not negligent, or that the passenger was contributorily negligent. The latter defense is held unavailable where the negligence of the ferryman was the sole proximate cause of the damage or death.
In the case at bar, the deceased passenger drove with all proper care and precaution onto the ferry, and as there were other cars to be loaded behind her, it was her duty to drive close to the barrier which she continued to do in a careful and prudent manner at a slow speed estimated at not more than four miles per hour. For some unknown and unexplained reason, the car rolled into the chain without check. This is a situation as could and should have been reasonably foreseen by the operators of the ferry and guarded against by a barrier or barriers of sufficient strength and construction to have prevented this slow moving automobile from proceeding onto the ramp suspended a distance of sixteen feet from the boat over the water and used in disembarking the passengers, and off of the open end of the ramp into-the river. The pictures and the evidence, as well as an offering of the straightened eye-bolt which was five-eighths of an inch in diameter, reveal a low-hanging single chain of defective construction and lacking in the necessary strength to serve the purpose intended. There is no reason why the necessary two or three chains or any other kind of barrier of suitable strength should not be used and no reason why this ramp, which could be lowered and raised, that was used in disembarking should not have been raised as an additional barrier, or an additional barrier placed at the end of this open ramp if the ferryman expected people who might break through the flimsy barrier to save themselves within the 16 feet left before almost certain death.
In the case at bar the deceased driver of the automobile had the legal right to assume that the operator of the ferry had performed his full duty toward her in the maintenance and operation of the boat, as there were no circumstances apparent that could or should have put her on guard as to the total defective construction of the single barrier chain. She was required to drive close to this chain in order that the car following could load on this boat which was sixty feet in length with the chain approximately a foot from the end of the boat where the unloading ramp was attached. We, therefore, find that the operators of the ferry have failed to free themselves of negligence- and, on the contrary, we find them guilty of gross negligence in failing to have the boat equipped with a barrier or barriers of sufficient strength and construction to secure the *38 safety of the passengers from the possibility of a foreseeable accident.
We next come to the question of whether the negligence of the operators of the ferry was the sole proximate cause of the accident, or whether they have proven that the deceased driver of the automobile was guilty of negligence contributing proximately to her death. It is the defendants contention that the deceased was guilty of such negligence in that she was proceeding at a slow rate of speed and should have applied her brakes and brought her car to a stop before hitting the chain, and even after the chain broke that she had sufficient time to apply the brakes and prevent the car from going off the end of the unloading ramp.
We can only think of two reasons why the driver of the car did not apply the brakes before contact between the chain and the car. One is that the chain was hung so low and she was required to drive within a distance close to the chain where she was unable to see the chain unless she deliberately looked to the post at a point where it was attached, and, therefore, misjudged the distance and rolled or drove into the chain at a very low speed. The other reason would be that the brakes were totally defective when applied. The testimony in this record as to the brakes was given by the husband of the deceased. He testified that as far as he knew from driving the car during the short interval before the accident that he could find no defect. He went to the Hatton Motor Company after the car had been gotten out of the river and brought there and inquired of Mr. Hatton as to the condition of the brakes. The latter told him: “He said that you actually couldn’t tell nothing about the brakes. He said he hadn’t fooled with it on account of the insurance.” The husband did not know if anyone else had checked the brakes or not. There is no other testimony with regard to the condition of the brakes other than witnesses at the scene of the accident who were not m a position to see whether a red brake light came on or not. It is, of course, possible, but not proven by the record, that the brakes on this used Packard could have become totally useless or defective just prior to boarding the ferry without the knowledge of the deceased driver. It is difficult to believe that the deceased driver, who was familiar with crossing ferries as she was raised in this vicinity, would not have stopped the car unless the brakes were totally defective, and such condition was unknown to her or due to the height of the chain she misjudged the distance and the car rolled into the chains and straightened out the unwelded eye bolt at which time the front wheels would have been on the unloading ramp, and, with almost certain death staring her in the face at a distance of sixteen or less feet at the end of the open unloading ramp, she “froze” and for that reason was unable or failed to apply the brakes.
In either event, we do not believe that the striking of the chain by the car was a proximate cause of the accident and resulting death, but that under the law the deceased driver used all the care required in boarding the ferry and proceeding toward this chain, and that at the slow speed she had the right to assume that the operators of the ferry would have a barrier sufficient to prevent the car from going off the boat onto the open ramp and into the river. The barrier which they had was the same as if there had been no barrier as far as fulfilling the purpose for which it was placed across the opening to the unloading ramp. The ferry operators were charged with the legal duty of preventing that automobile, under the facts, from ever going out on the open-ended unloading platform. Their negligence in this respect created the perilous situation. Under the law, she did not create the perilous situation because she had a legal right to assume that when she came on the ferry in a cautious, slow, prudent and careful manner, that she would be fully protected by the barrier should she misjudge the distance or for some other unknown and unforeseeable rea *39 son roll into or strike the chain barrier at the slow speed of three or four miles per hour. They cannot be heard to say that “we admit our gross negligence in failing to provide the proper barrier to prevent this accident but even if we did you still had twelve to sixteen feet distance on the unloading ramp to avoid the accident by the application of your brakes.” They are charged with knowledge of the defective barrier and cannot escape liability by expecting the operator of a car to cooly and calmly bring it to a stop within twelve to sixteen feet where they have created by their negligence a situation which would be anticipated to deprive the driver of the ability to act. Had the barrier been properly constructed, the force of the car at its slow speed would not have destroyed it and, therefore, the sole proximate cause of this accident was the negligence of the ferry operators. Neither have they borne the burden of proof which would convict the driver of contributory negligence.
 The Lower Court awarded $5,000 to plaintiff, the husband of Mrs. Gunter, for loss of love, affection and companionship of his wife, and funeral expenses in the amount of $1306.22. Counsel for defendant contends that the award of $5,000 is excessive in view of the fact that plaintiff re-married about six months after the death of his wife. From the record it appears that Mrs. Gunter was 35 years of age at the time of her death; that she and plaintiff had been married about five years; they had no children; that Mrs. Gunter had been married once before and that plaintiff had been married twice before. At the time of her death Mrs. Gunter was in training to become a practical nurse and was also selling Avon toilet products. Since damages for loss of love, affection and companionship are speculative in nature, much discretion must be left to the trial judge. He is in a position to observe the witnesses and his awards as concerns quantum will not be disturbed unless manifestly erroneous.
Under the circumstances we do not feel that the trial judge has abused his discretion in awarding the plaintiff $5,000 for loss of love, affection and companionship of his wife. See Pitre v. Roberie, La.App. 1 Cir., 1959, 117 So.2d 74.
For the reasons assigned, the judgment of the lower court is affirmed.
Affirmed.